**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STACY MORGAN; ASHLEY BOLDS; NICHOLE CAMPBELL; KIT CAMPBELL; DONARA SWYGARD; CHANTELLE HALL; ASHLEY ASTROLOGO; JACOB ASTROLOGO; ELIZABETH BELTRAN; ROMEO BELTRAN; ALEXIA GAITHER; LATONYA BURRIS; ERIC WASHINGTON; KESSHA EDWARDS; CHRISTOPHER EDWARDS; MARY MIKEL; JESSICA PADILLA; MELANIE BROOKS; KYLE BROOKS; LACHADRA MCGEE; GINA DAVIS; AFDEN ACOSTA; DANIELLE WRIGHT; FRANCESCA OLIVARRI; JACOBA OGG; EMILY GREENHILL, DORI MARTINEZ, <br><br> Plaintiffs, <br> vs. <br><br> BAYER, CORP.; BAYER HEALTHCARE, LLC; BAYER ESSURE, INC.; BAYER HEALTHCARE PHARMACEUTICALS, INC.; and BAYER A.G., <br><br> Defendants. | NO.: <br><br><br><br><br> JURY TRIAL DEMANDED |

**CONSOLIDATED CIVIL COMPLAINT**

1.　　　　NOW COMES Plaintiffs STACY MORGAN; ASHLEY BOLDS;

NICHOLE CAMPBELL; KIT CAMPBELL; DONARA SWYGARD; CHANTELLE HALL;

ASHLEY ASTROLOGO; JACOB ASTROLOGO; ELIZABETH BELTRAN; ROMEO

BELTRAN; ALEXIA GAITHER; LATONYA BURRIS; ERIC WASHINGTON; KESSHA

EDWARDS; CHRISTOPHER EDWARDS; MARY MIKEL; JESSICA PADILLA; MELANIE

BROOKS; KYLE BROOKS; LACHADRA MCGEE; GINA DAVIS; AFDEN ACOSTA;

DANIELLE WRIGHT; FRANCESCA OLIVARRI; JACOBA OGG; EMILY GREENHILL; and

DORI MARTINEZ, who in filing this Consolidated Complaint seek judgment against

Defendants BAYER CORP.; BAYER HEALTHCARE PHARMACEUTICALS, INC.; BAYER

HEALTHCARE, LLC; BAYER ESSURE, INC.; and BAYER A.G. (hereinafter collectively

referred to as "Defendants") for the personal injuries they sustained as a result of being

prescribed, receiving, and subsequently using the defective and unreasonably dangerous

permanent birth control device Essure®.  At all times relevant hereto, Essure® was manufactured,

designed, formulated, tested, packaged, labeled, produced, created, made, constructed,

assembled, marketed, advertised, distributed, and sold by Defendants or Conceptus, Inc., which

was acquired by Defendants on or about April 28, 2013.

# I

## INTRODUCTION

2.      This civil action is asserted by Plaintiffs who relied to their detriment on

Defendants' express warranties as to the safety and effectiveness of the permanent birth control

device, Essure®.  As a result of Defendants' negligence and Plaintiffs' detrimental reliance on

Defendants' warranties that Essure® was safe and effective, Plaintiffs have suffered a range of

injuries, including, but not limited to, ectopic pregnancy, full-term pregnancy, pregnancy loss,

perforation of organs, device migration, hysterectomies, severe abdominal and menstrual pain,

pain during intercourse, heavy bleeding, migraines, back pain, depression, fatigue, weight

fluctuation, and autoimmune diseases.

3.      In November 2002, the FDA granted Essure® Conditional Premarket Approval

("CPMA").  However, this CPMA has since become invalid and Essure® an adulterated product

as Defendants violated several of the conditions imposed by the FDA.  Defendants failed to

submit annual follow-ups for women who participated in original clinical trials, failed to conduct post-approval studies, and failed to report complaints of adverse events to the FDA.  Most notably, Defendants failed to notify the FDA of their internal records of over 16,000 complaints regarding Essure®.  Defendants also used misleading and false advertising in marketing Essure® as they misrepresented results of clinical trials and post-CPMA trials.

4.      Further, Defendants have been cited by the FDA for (1) failing to report and actively concealing eight perforations caused by Essure®; (2) erroneously using non-conforming material in manufacturing Essure®; (3) failing to use pre-sterile and post-sterile cages in manufacturing Essure®; and (4) manufacturing Essure® for years at an unlicensed manufacturing facility.  As such, Defendants' violations not only invalidated the CPMA for Essure® but also endangered Plaintiffs' lives and the safety of the public.

## II

## PARTIES, JURISDICTION AND VENUE

5.      Plaintiff STACY MORGAN is a citizen of Rincon, Georgia.

6.      Plaintiff ASHLEY BOLDS is a citizen of Warner Robins, Georgia.

7.      Plaintiff NICHOLE CAMPBELL is a citizen of Fort Walton Beach, Florida.

8.      Plaintiff KIT CAMPBELL is a citizen of Fort Walton Beach, Florida.

9.      Plaintiff DONARA SWYGARD is a citizen of Hialeah, Florida.

10.      Plaintiff CHANTELLE HALL is a citizen of Miami, Florida.

11.      Plaintiff SARAH ASTROLOGO is a citizen of High Springs, Florida.

12.      Plaintiff JACOB ASTROLOGO is a citizen of High Springs, Florida.

13.      Plaintiff ELIZABETH BELTRAN is a citizen of Henderson, North Carolina.

14.      Plaintiff ROMEO BELTRAN is a citizen of Henderson, North Carolina.

15.     Plaintiff ALEXIA GAITHER is a citizen of Hickory, North Carolina.

16.     Plaintiff LATONYA BURRIS is a citizen of Chicago, Illinois.

17.     Plaintiff ERIC WASHINGTON is a citizen of Chicago, Illinois.

18.     Plaintiff KESSHA EDWARDS is a citizen of Florissant, Missouri.

19.     Plaintiff CHRISTOPHER EDWARDS is a citizen of Florissant, Missouri.

20.     Plaintiff MARY MIKEL is a citizen of Columbia, Missouri.

21.     Plaintiff JESSICA PADILLA is a citizen of Taos, New Mexico.

22.     Plaintiff MELANIE BROOKS is a citizen of Ashland City, Tennessee.

23.     Plaintiff KYLE BROOKS is a citizen of Ashland City, Tennessee.

24.     Plaintiff LACHADRA MCGEE is a citizen of Houston, Texas.

25.     Plaintiff GINA DAVIS is a citizen of Rosenberg, Texas.

26.     Plaintiff AFDEN ACOSTA is a citizen of Beaumont, Texas.

27.     Plaintiff DANIELLE WRIGHT is a citizen of Fort Worth, Texas.

28.     Plaintiff JACOBA OGG is a citizen of Apple Valley, California.

29.     Plaintiff EMILY GREENHILL is a citizen of Apple Valley, California.

30.     Plaintiff DORI MARTINEZ is a citizen of Stockton, California.

31.     BAYER CORP. is a for-profit corporation that was incorporated in the state of Indiana, with its principal place of business in the Commonwealth of Pennsylvania at 100 Bayer Road, Building 4, Pittsburgh, Pennsylvania 15205.  As such, Defendant is authorized to do and does business through the Commonwealth of Pennsylvania.

32.     BAYER CORP. is the parent corporation of BAYER HEALTHCARE, LLC, BAYER ESSURE, INC., and BAYER HEALTHCARE PHARMACEUTICALS, INC. (the "Bayer subsidiaries").  BAYER CORP. owns 100 percent of the Bayer subsidiaries.

4

33.     BAYER CORP. is wholly owned by BAYER A.G.

34.     BAYER A.G. is a German for-profit corporation.  Defendant BAYER A.G. is authorized to do and does business throughout the Commonwealth of Pennsylvania.

35.     At all times relevant herein, the BAYER subsidiaries are agents or apparent agents of BAYER CORP. and/or BAYER A.G.  As such, each Defendant acted as agents of the other Defendants and acted within the course and scope of the agency regarding the acts and omissions alleged.  Additionally, Defendants together acted in concert and/or abetted each other and conspired to engage in the common course of misconduct alleged herein for the purpose of enriching themselves and creating an injustice at the expense of Plaintiffs.

36.     Further, the Bayer subsidiaries, individually and/or collectively, are "Alter Egos" of BAYER CORP. and/or BAYER A.G. as, *inter alia*, they are wholly owned by BAYER CORP; share the same trademark; share management and officers; and in other ways were dominated by BAYER CORP.

37.     Moreover, there exists and at all times relevant herein there existed a unity of interest in ownership among all Defendants such that individuality and separateness between and among them has concluded.  Since Defendants are "Alter Egos" of one another and exert control over each other, adherence to the fiction of separate existence of these Defendants as entities distinct from one another will permit an abuse of the corporate privilege, sanction fraud and promote injustice.  BAYER CORP. and BAYER A.G. wholly ignored the separate status of the Bayer subsidiaries and so dominated and controlled its affairs that its separate entities were a sham.

38.     Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC., is a for-profit corporation incorporated in the state of Delaware.  Defendant BAYER HEALTHCARE

PHARMACEUTICALS, INC.'s headquarters are located at 100 Bayer Boulevard, Whippany, New Jersey.  Defendant is authorized to and does business throughout the Commonwealth of Pennsylvania.

39.    Defendant BAYER HEALTHCARE, LLC, is a for-profit corporation incorporated in the state of Delaware.  Defendant BAYER HEALTHCARE, LLC's headquarters are located at 100 Bayer Boulevard, Whippany, New Jersey.  Defendant is authorized to and does business throughout the Commonwealth of Pennsylvania.

40.    Defendant BAYER ESSURE, INC., is a for-profit corporation incorporated in the state of Delaware.  Defendant BAYER ESSURE, INC.'s headquarters are located at 100 Bayer Boulevard, Pittsburgh, Pennsylvania.  Defendant is authorized to and does business throughout the Commonwealth of Pennsylvania.

41.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" and though the causes of action alleged herein are rooted in state law, Plaintiff alleges that Defendants failed to 1) meet regular reporting requirements, 2) report known hazards to the Food and Drug Administration ("FDA"), and 3) comply with federal laws regarding marketing and distribution of the Essure® device, thereby invalidating the Premarket Approval and making distribution of the Essure® device and sale to the Plaintiffs illegal under the Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301, *et seq.*  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

42.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(2) and (3) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and Defendants regularly transact substantial business in this district and are subject to

personal jurisdiction in this district.  Additionally, Defendants have advertised in this district and

have received substantial revenue and profits from their sales of Essure® devices in this district;

therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in

part, within this district.

43.     This Court has personal jurisdiction over Defendants because they have

conducted substantial business in this judicial district, and intentionally and purposefully placed

the Essure® devices into the stream of commerce within Pennsylvania and throughout the United

States.

**III**

**PLAINTIFFS' HISTORIES**

44.     As discussed in depth below, each of the Plaintiffs in this case has sustained

serious physical injuries as a result of being implanted with the permanent birth control device,

Essure®.  Accordingly, as a result of (1) Defendants' negligence described *infra*; and

(2) Plaintiffs' reliance on Defendants' warranties, Defendants' Essure® devices have caused

Plaintiffs serious personal injuries.  As such, Plaintiffs have suffered a range of injuries, such as

ectopic pregnancy, actual pregnancy, abdominal pain, depression, fatigue, heavy bleeding, pain

during intercourse, weight fluctuations, severe back pain, and migraines.  Additionally, some

Plaintiffs' Essure® devices have migrated, perforated, and even become embedded in areas

outside of the fallopian tubes.  Moreover, some Plaintiffs have been forced to undergo

hysterectomies in an effort to have their Essure® devices removed.

**A.     GEORGIA**

    **1.     Stacy Morgan**

45.     Plaintiff Stacy Morgan is a resident of Rincon, Georgia.

46.     In or around 2011, Plaintiff Morgan underwent the Essure® procedure performed by Dr. Stanley Morgan at Statesboro OB/GYN located in Statesboro, Georgia.

47.     While Plaintiff initially requested a tubal ligation—her doctor recommended she undergo the Essure® procedure instead.  In promoting Essure®, Plaintiff's physician informed her that it was a "less invasive" and "permanent" birth control solution.  As such, Plaintiff followed the advice of her doctor and underwent the Essure® procedure.

48.     Yet, shortly after undergoing the Essure® procedure, Plaintiff began to suffer severe abdominal and back pain as well as heavy bleeding.

49.     Additionally, Plaintiff Morgan experienced depression, fatigue and pain during intercourse after she underwent the Essure® procedure.  Further, after undergoing the Essure® procedure, Plaintiff saw a fluctuation in her weight.

50.     As a result of the severe pain Plaintiff suffered after being implanted with Essure®, she has been prescribed Tramadol and ibuprofen.

51.     Moreover, in 2014, Plaintiff Morgan was sent to the ER as a result of her heavy bleeding.  While Plaintiff was in the ER, Dr. James Hiller performed a biopsy on her in order to rule out cancer.

52.     Shortly after being sent to the ER as a result of Plaintiff's heavy bleeding, she visited her current OB/GYN, Dr. Toni Sylvester of Rincon, Georgia.  Sometime in September or October 2015, after researching Essure®, Dr. Sylvester informed Plaintiff that her symptoms of irregular and heavy bleeding could have been caused by complications with her Essure® device.  At the same time, Plaintiff was prescribed birth control pills to help reduce her heavy bleeding as well as Provera to help regulate her menstrual cycle.

53.     Plaintiff has discussed the possibility of undergoing a hysterectomy as an option for removal of the devices.  However, at only 33 years of age, Plaintiff Morgan is trying to avoid the possibility of undergoing a hysterectomy.

54.     Plaintiff Morgan also recalls her doctor giving her a brochure for Essure® that promoted the device as a safe and effective form of permanent birth control.  Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result, Plaintiff now suffers from severe abdominal and back pain, as well as fatigue, depression, heavy bleeding, weight fluctuations and pain during intercourse.  Additionally, Plaintiff may have no choice but to undergo a hysterectomy in order to have her Essure® removed.  Moreover, Plaintiff has since been taking prescription medication in order to manage her severe pain.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff Morgan would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations as to the safety and effectiveness of Essure® as a form of permanent birth control.

### 2.     Ashley Bolds

55.     Plaintiff Ashley Bolds is a resident of Warner Robins, Georgia.

56.     On or around December 31, 2014, Plaintiff Bolds underwent the Essure® procedure performed by Dr. Judson J. Shelnutt at Shelnutt OB/GYN located in Athens, Georgia.

57.     Shortly after undergoing the Essure® procedure, Plaintiff Bolds began to suffer severe menstrual, abdominal and back pain.

58.     As a further result of being implanted with Essure®, Plaintiff now suffers from depression and fatigue.

59.     Additionally, after undergoing the implantation of Essure®, Plaintiff Bolds also began suffering pain during intercourse, heavy bleeding, and weight fluctuations.

60.     Moreover, despite Plaintiff being implanted with Essure® for more than three months she learned she was pregnant.  Plaintiff gave birth to a baby on February 19, 2016.  The baby was born with hearing loss.

61.     Additionally, on or around April 2014, Dr. Judson Shelnutt informed Plaintiff that her symptoms were most likely related to her Essure® device.

62.     Further, Plaintiff Bolds also recalls reviewing a brochure for Essure® that promoted the device as a safe and effective form of permanent birth control.  Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result of being implanted with Essure®, Plaintiff not only gave birth to a child with hearing loss but she also now suffers from severe abdominal, menstrual and back pain, as well as fatigue, depression, heavy bleeding, weight fluctuations and pain during intercourse.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff Bolds would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations as to the safety and effectiveness of Essure® as a form of permanent birth control.

**B.     FLORIDA**

    **1.     Nichole Campbell**

63.     Plaintiff Nichole Campbell is a resident of Fort Walton Beach, Florida.

64.     On or around September 26, 2014, Plaintiff Campbell underwent the Essure® procedure performed by Dr. Jessica Ortolano at the office of the 96th Medical Group located in Florida on the Eglin Air Force Base.

65.    Shortly after undergoing the Essure® procedure Plaintiff Campbell began suffering severe menstrual and abdominal pain.

66.    Additionally, after being implanted with Essure®, Plaintiff also began to suffer from heavy bleeding and pain during intercourse, as well as weight fluctuations.

67.    Further, sometime in January 2015, Plaintiff had an HSG performed, which confirmed the proper placement of her Essure® devices.

68.    Moreover, Plaintiff's pelvic pain grew to such an extent that in June 2015, she was prescribed Percocet.

69.    Additionally, on or around July 2015, Plaintiff underwent a sonogram which revealed that she had a physiologic cyst on her left ovary, which was confirmed on radiologic examination as possibly being correlated to Plaintiff's Essure®.

70.    On or around November 17, 2015, Plaintiff underwent the laparoscopic removal of Essure® also performed by Dr. Jessica Ortolano.  During this procedure Plaintiff's fallopian tubes and the Essure® devices were removed.  During removal it was discovered that a piece of one of the coils was on the peritoneum over the rectum.  That piece was not removed.

71.    Plaintiff Campbell also recalls reviewing a brochure for Essure® while going over her birth control options with her doctor.  Specifically, Plaintiff recalls the Essure® brochure she reviewed emphasizing the Essure® procedure's short recovery time, which was a major selling point for Plaintiff.  Further, Plaintiff also recalls conducting her own research on Essure®, during which she reviewed Essure®'s website that also promoted the Essure® procedure by emphasizing its short recovery time.  Plaintiff relied on Defendants' misrepresentations in the Essure® brochure and their website as to Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result of being implanted with Essure®, Plaintiff now suffers

11

from severe abdominal and menstrual pain, as well as heavy bleeding, weight fluctuations and

pain during intercourse.  Moreover, Plaintiff was also required to undergo the surgical removal

of her fallopian tubes and Essure® coils as a result of being implanted with Essure®.  Plaintiff

relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff

Campbell would not have chosen to undergo the implantation of Essure® had she not relied on

Defendants' misrepresentations in the Essure® brochure and the Essure® website as to the safety

of the device and short recovery from the Essure® procedure.

**2.      Kit Campbell**

72.      Plaintiff Kit Campbell is a resident of Fort Walton Beach, Florida.

73.      Plaintiff Kit Campbell has been married to Plaintiff Nichole Campbell since

November 2006.  Plaintiff has suffered a loss of consortium as a result of his wife's injuries.

74.      Specifically, the couple's level of sexual intimacy has sharply declined since

Plaintiff's wife underwent the Essure® procedure as she struggles through pain during

intercourse.  While the couple once had a healthy sex life prior to his wife being implanted with

Essure®, after the implant, sexual intimacy between Plaintiff and his wife is a rarity.  As such,

the couple's lack of sexual intimacy has resulted in Plaintiff and his wife feeling less emotionally

intimate and being more irritable with one another, which in turn has led to more arguments and

increased stress between them.

75.      Moreover, while Plaintiff's wife exercised daily prior to being implanted with

Essure®, after undergoing the Essure® procedure, Plaintiff's wife is now in too much pain to do

any of the physical activities she used to enjoy such as exercise, including running on the

treadmill and exercising regularly with her husband.

12

76.    Further, Plaintiff's wife is no longer able to perform her once-everyday household chores such as doing laundry for the household, washing and putting away dishes, and other household duties.  Additionally, Plaintiff's wife can no longer grocery shop for the household as she always did prior to being implanted with Essure®.  Plaintiff's wife is now in too much pain to lift anything of substantial weight, which gets in the way of her grocery shopping duties.  As such, Plaintiff has since taken over performing these everyday household chores as his wife is no longer able to as a result of being implanted with Essure®.

77.    Plaintiff's family life has also been adversely affected by his wife's Essure-related injuries.  As such, the couple's two children (ages 4 and 8) have complained to Plaintiff about how their relationship with their mother has been effected since she underwent the Essure® procedure.  Accordingly, Plaintiff's children have complained to him that their mother is no longer able to take walks with them through their neighborhood, to sit on the floor and play with them and to take them to the park and push them on the swings.  Additionally, Plaintiff reports that family outings, such as to the zoo, have been cancelled as a result of Plaintiff's Essure®-related injuries, such as abdominal cramps that leave Plaintiff unable to be on her feet for long hours at a time.

78.    Plaintiff has been damaged by the loss of his wife's comfort, care, society

**3.    Donara Swygard**

79.    Plaintiff Donara Swygard is a resident of Hialeah, Florida.

80.    On or around November 2011, Plaintiff Swygard underwent the Essure® procedure performed by Dr. Pablo Uribasterra at Femlife Healthcare for Women located in Pembroke Pines, Florida.

81.     Shortly after being implanted with Essure® Plaintiff began suffering severe menstrual, abdominal and back pain.

82.     Additionally, after undergoing the implantation of Essure® Plaintiff also began suffering from depression and fatigue.

83.     Plaintiff also began suffering from heavy bleeding, pain during intercourse and weight fluctuations.

84.     Plaintiff has an allergy to nickel—the exact material from which Essure® is manufactured.

85.     Plaintiff's pain from her Essure®-related injuries grew so severe that she was prescribed Percocet and has even been hospitalized for further treatment.

86.     On or around October 6, 2014, Plaintiff underwent the removal of her Essure® device through a hysterectomy performed by Dr. Jacob Tangir, who was also the physician who informed Plaintiff that her injuries were mostly likely caused by Essure®.

87.     Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.

**4.     Chantelle Hall**

88.     Plaintiff Chantelle Hall is a resident of Miami, Florida.

89.     On or about March 2014, Plaintiff Hall underwent the Essure® procedure which was performed by Dr. Randy Fink at the Miami Center of Excellence for Obstetrics & Gynecology, located in Miami, Florida.  She learned she was pregnant approximately 4 months after the Essure® was implanted.

90.     In addition to becoming pregnant after implantation of Essure, Plaintiff Hall suffered and continues to suffer from severe menstrual and abdominal pain, as well as heavy bleeding.

91.     Further, Plaintiff Hall suffers from depression and fatigue.  Plaintiff has also began suffering migraines—for which she had no prior history before undergoing the Essure® procedure.

92.     Plaintiff is currently consulting her doctors as to whether she should undergo tubal ligation and removal of Essure®.  She anticipates having to undergo tubal ligation in order to have her Essure® removed.

93.     Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.

**5.     Sarah Astrologo**

94.     Plaintiff Sarah Astrologo is a resident of High Springs, Florida.

95.     On or around October 6, 2014, Plaintiff underwent the Essure® procedure performed by Dr. Michael Cotter at the offices of Gainesville OBGYN located in Gainesville, Florida.

96.     Shortly undergoing the Essure® procedure Plaintiff began to suffer severe menstrual, abdominal and back pain.

97.     Additionally, Plaintiff also began suffering from depression and fatigue after she was implanted with Essure®.

98.     Moreover, after being implanted with Essure®, Plaintiff also began experiencing heavy bleeding, as well as pain during intercourse.

99.     In fact, Plaintiff's pain from her Essure®-related injuries has become so severe that she has since been prescribed Hydrocodone as treatment.

100.     Additionally, Plaintiff's Essure®-related injuries have caused her to be hospitalized numerous times since Plaintiff was implanted with the devices.

101.     In addition to being hospitalized several times since being implanted with Essure®, Plaintiff has also made frequent visits to the emergency room for severe migraines and abdominal pain.  In 2015, Plaintiff went to the ER twice for abdominal pain.

102.     Given her numerous visits to the ER, she has been prescribed Lortab, Tramadol, and Baclofen to treat the chronic pain she suffers as a result of being implanted with Essure®. Additionally, Plaintiff Astrologo has also been prescribed Fiorcet for her migraines, which she experienced prior to being implanted with Essure® but which have become more severe since Plaintiff's Essure® procedure.

103.     Further, after undergoing the implantation of Essure®, Plaintiff's MRSA, which she was diagnosed with at age 16, has become more severe.  As such, whereas prior to Plaintiff receiving Essure® she went to the ER once or twice a month, Plaintiff now goes to the ER anywhere from five to eight times a month in order to treat her MRSA boils.  Additionally, Plaintiff has been prescribed the antibiotic Cipro to treat her MRSA.

104.     Even worse, when Plaintiff Astrologo was given an HSG, it was determined that only the Essure® coil on her right side was in place.  The location of the left coil could not be determined.

105.     Plaintiff's physicians have suggested that she undergo a hysterectomy in order for the Essure® to be removed.

106.    Plaintiff Astrologo recalls reviewing a brochure promoting Essure® as it apparently seemed to be "the new thing" covered by Medicaid.  Accordingly, Plaintiff recalls being informed that Medicaid would not cover Plaintiff's tubal ligation.  Further, she recalls this brochure promoting Essure® as a safe and effective form of birth control.  As such, Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result of being implanted with Essure®, Plaintiff now suffers from severe abdominal and menstrual, and back pain, as well as heavy bleeding and pain during intercourse.  Moreover, Plaintiff has visited the ER several times for migraines, severe abdominal pain, and MRSA outbreaks since being implanted with Essure®.  Furthermore, given the migration of her left-side coil, it is likely that Plaintiff will have to endure surgical removal of the devices by undergoing a hysterectomy.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff Astrologo would not have chosen to undergo implantation of Essure® had she not relied on Defendants' misrepresentations in the Essure® brochure.

### 6.    Jacob Astrologo

107.    Plaintiff Jacob Astrologo is a resident of High Springs, Florida.

108.    Plaintiff Jacob Astrologo is married to Plaintiff Sarah Astrologo.  As such, Plaintiff has suffered a loss of consortium as a result of his wife's Essure®-related injuries.

109.    As a result of his wife's injuries, Plaintiff is now responsible for most household chores, such as cleaning, running errands, and caring for the couple's three children (ages 2, 5, and 6).

110.    Moreover, Plaintiff fears that he may be unable to work full-time when their children are out of school during the summer months, as his wife is unable to care for the children as she did prior to being implanted with Essure®.

111.    Additionally, the couple's level of sexual intimacy sharply declined after his wife was implanted with Essure®.

112.    Accordingly, Plaintiff's relationship with his wife has been adversely affected after his wife underwent the implantation of Essure® and Plaintiff has suffered and continues to suffer damages as a result.

## C.    NORTH CAROLINA

### 1.    Elizabeth Beltran

113.    Plaintiff Elizabeth Beltran is a resident of Henderson, North Carolina.

114.    On or around September 27, 2011, Plaintiff underwent the Essure® procedure performed by Dr. Scott Hays at the offices of Premier Women's Health Professionals located in Henderson, North Carolina.

115.    In or around December 2011, Plaintiff received a phone call after having an HSG performed whereby she was told that "everything is in place."

116.    Shortly after undergoing the Essure® procedure Plaintiff began suffering severe menstrual, abdominal, and back pain.

117.    Additionally, after being implanted with Essure® Plaintiff also experienced symptoms of depression and fatigue.

118.    Further, Plaintiff began suffering heavy bleeding and pain during intercourse after being implanted with Essure®.

119.    Additionally, after being implanted with Essure® Plaintiff's blood pressure spiked to such an extent that she was required to take blood pressure medication.  Plaintiff also began to suffer from frequent bacterial infections, such as urinary tract infections and yeast infections which she did not experience prior to being implanted with Essure®.

120.    On or around April 27, 2016, Plaintiff underwent the surgical removal of her Essure®, which was performed by Dr. Janelle Moulder at the offices of UNC Minimally Invasive Gynecologic Surgery located in Hillsborough, North Carolina.

121.    After her Essure® was removed, Plaintiff recalls being shown photos from her surgery, which showed her left-side Essure® coil hanging outside of her fallopian tube.

122.    After undergoing the surgical removal of her Essure® device, Plaintiff experienced immediate relief and reports that she "feels like a brand new person" now that the devices have been removed.  Further, after having her Essure® removed Plaintiff's blood pressure returned to normal and she has since ceased taking blood pressure medication.  Additionally, since having the device removed Plaintiff has more energy and the pain she suffered after being implanted with Essure® has ceased.

123.    Plaintiff Beltran recalls reviewing an Essure® brochure, which currently remains in her possession.  Specifically, Plaintiff recalls relying on Defendants' misrepresentations as to Essure® requiring no surgery and that the procedure could be performed in the setting of a doctor's office.  Further, Plaintiff recalls the Essure® brochure promoting the device as being a permanent, hormone-free form of birth control.  Plaintiff relied on Defendants' misrepresentations in this Essure® brochure and, based thereon, decided to undergo the implantation of Essure®.  As a result of undergoing the implantation of Essure®, Plaintiff suffered severe menstrual, abdominal, and back pain, as well as depression, fatigue, pain during

intercourse, heavy bleeding, bacterial infections, and high blood pressure.  Moreover, Plaintiff was subjected to further surgery when she was required to undergo the surgical removal of her Essure®.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff Beltran would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations in the brochure as to the safety and permanency of Essure®.

### 2.     Romeo Beltran

124.    Plaintiff Romeo Beltran is a resident of Henderson, North Carolina.

125.    Plaintiff Romeo Beltran is married to Plaintiff Elizabeth and has suffered a loss of consortium as the result of his wife's Essure®-related injuries.

126.    Shortly after Plaintiff's wife was implanted with Essure®, she began showing signs of depression, fatigue, and pain, which resulted in her being unable to complete her normal household duties as a mother and wife.

127.    As such, the couple's level of sexual intimacy sharply declined as she began suffering pain during intercourse.

128.    Additionally, communication between Plaintiff and his wife also became strained as a result of her depression, pain, and having to visit multiple doctors without receiving definitive answers as to the cause of her pain.

129.    Due to his wife's depression and loss of energy, she could no longer maintain working a job, which only further financially and emotionally strained Plaintiff's relationship with his wife.

130.    In addition to being charged with caring for his wife, Plaintiff has also taken over caring for the couple's two daughters without his wife's help.

131.    At the time Plaintiff's wife chose to undergo the Essure® procedure, their family was complete and as such, they believed that his wife's Essure® procedure would have improved their lives for the better.  However, in the time between his wife being implanted with the device and it being removed, their lives were changed only for the worst.

**3.    Alexia Gaither**

132.    Plaintiff Alexia Gaither is a resident of Hickory, North Carolina.

133.    In or around July 2010, Plaintiff underwent the Essure® procedure at Frye Regional Medical Center located in Hickory, North Carolina.

134.    Shortly undergoing the Essure® procedure Plaintiff began to suffer severe menstrual, abdominal and back pain.

135.    Additionally, Plaintiff also began suffering from depression and fatigue after she was implanted with Essure®.

136.    Moreover, after being implanted with Essure®, Plaintiff also began experiencing heavy bleeding, as well as pain during intercourse.

137.    Plaintiff has also been diagnosed as being allergic to Nickel—the exact metal from which Essure® is manufactured.

138.    Further, after undergoing the implantation of Essure® Plaintiff also began suffering from migraines—for which she had no history of suffering prior to being implanted with Essure®.

139.    Additionally, after being implanted with Essure®, Plaintiff also began suffering urinary tract infections, which was not a normal occurrence for Plaintiff prior to undergoing the implantation of Essure®.  Further, during one of her many visits to the ER, Plaintiff was given a

vaginal ultrasound, which confirmed the presence of ovarian cysts.  However, at the same time Plaintiff was told that her left-sided coil could not be located.

140.    In fact, Plaintiff's pain became so severe that she was prescribed Oxycodone for pain she suffered as a result of being implanted with Essure®.

141.    Plaintiff Gaither recalls reviewing a brochure for Essure® that promoted the device as a safe and highly effective form of permanent birth control, with no serious side effects.  Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result, Plaintiff now suffers from severe menstrual, abdominal, and back pain, as well as fatigue, depression, urinary tract infections, heavy bleeding, and pain during intercourse.  Additionally, Plaintiff may have no choice but to undergo a hysterectomy in order to have her Essure® device removed.  Plaintiff had to take prescription medication in order to manage her severe pain.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff Gaither would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations as to the safety and effectiveness of Essure®.

**D.    ILLINOIS**

   **1.    Latonya Burris**

142.    Plaintiff Latonya Burris is a resident of Chicago, Illinois.

143.    On or around October 30, 2015, Plaintiff Latonya Burris underwent the Essure® procedure performed by Dr. Monica Moore at the offices of Women to Women Healthcare & Wellness located in Chicago, Illinois.

144.    During Plaintiff's first implantation she recalls the first left-side coil breaking after it was placed in her body.  She also recalls the nurse calling the coil "defective" and leaving

the room to get another coil.  Plaintiff's right-side coil was implanted without any issues.

However, when the left-side coil was replaced and subsequently implanted in Plaintiff, she was

informed that the left-side coil was lost and Dr. Moore could not find where it migrated.

Plaintiff was sent home with a Nuvaring for temporary birth control.

145.    Approximately one (1) month after being implanted with Essure® Plaintiff was

referred to Rush Hospital, where another doctor attempted to find Plaintiff's left-side coil,

however this doctor was also unable to locate the left-side coil that migrated immediately after it

was implanted in Plaintiff.  At this point, there have been no other attempts to locate and/or

remove Plaintiff's left-side coil.

146.    While Plaintiff cannot recall whether she had an HSG performed subsequent to

being implanted with Essure®, she does recall being informed that she had a 50 percent chance

of becoming pregnant.

147.    Shortly after undergoing the Essure® procedure, Plaintiff began suffering severe

menstrual and back pain.

148.    Further, after being implanted with Essure® Plaintiff began suffering symptoms

of depression and fatigue.

149.    Plaintiff also began to suffer heavy bleeding, weight fluctuations, and pain during

intercourse.

150.    Additionally, Plaintiff also began experiencing severe migraines—for which she

had no history suffering prior to undergoing the implantation of Essure®.

151.    Plaintiff recalls reviewing an Essure® brochure that promoted Essure® as an

effective and permanent form of birth control.  Additionally, if Plaintiff underwent the

implantation of Essure®, she would no longer be required to pay $75 out-of-pocket for the

Nuvaring, which she had been using up until undergoing the Essure® procedure.  However, even after being implanted with Essure®, Plaintiff is still using a Nuvaring to control the heavy bleeding she now suffers as a result of Essure®.  Further, as a result of undergoing the implantation of Essure® Plaintiff suffers severe menstrual and back pain, as well as depression, fatigue, heavy bleeding, weight fluctuations, pain during intercourse and severe migraines. Plaintiff will likely have to undergo the surgical removal of the left-side coil that migrated immediately after it was implanted.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff Burris would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations in the Essure® brochure as to the safety and permanency of Essure®.

### 2.        Eric Washington

152.     Plaintiff Eric Washington is a resident of Chicago, Illinois.

153.     Plaintiff Eric Washington is married to Plaintiff Latonya Burris and has suffered a loss of consortium as a result of his wife's Essure®-related injuries.

154.     Shortly after Plaintiff's wife was implanted with Essure®, Plaintiff noticed that a change in his wife's demeanor as she was no longer as happy and energetic as she once was prior to undergoing the implantation of Essure®.

155.     Additionally, since Plaintiff's wife was implanted with Essure®, he has been the primarily responsible for tending to all household chores.

156.     Further, the couple's level of sexual intimacy sharply declined as Latonya suffers from pain during intercourse.

157.    As such, Plaintiff's relationship with his wife was adversely affected after she underwent the Essure® procedure.  He has suffered damages for the loss of his wife's care, comfort, society, love, and friendship, and he continues to suffer damages.

E.    **MISSOURI**

1.    **Kessha Edwards**

158.    Plaintiff Kessha Edwards is a resident of Florissant, Missouri.

159.    On or around August 11, 2011, Plaintiff Kessha Edwards underwent the Essure® procedure performed by Dr. Mark Hensley at Blessing Hospital located in Quincy, Illinois.

160.    Shortly after being implanted with Essure® Plaintiff Kessha Edwards began suffering severe menstrual and abdominal pain.  Plaintiff's abdominal pain increases in severity when stretching as she experiences a sharp pain shooting pain from her abdomen all the way up to her shoulder.

161.    Additionally, after undergoing the Essure® procedure, Plaintiff began suffering severe back pain and heavy bleeding with blood clotting.

162.    Plaintiff also began suffering pain during intercourse with bleeding which can last up to a week after Plaintiff engages in intercourse.  Her symptoms have now begun to interfere with Plaintiff's relationship with her husband as their sexual intimacy has decreased substantially since Plaintiff underwent the implantation of Essure®.

163.    Further, shortly after undergoing the implantation of Essure® Plaintiff was diagnosed with depression and anxiety.  Plaintiff is now prescribed Zoloft, which she is required to take four (4) times per day.

164.    Moreover, since being implanted with Essure® Plaintiff has suffered migraines so severe that she is now required to take a hydrocodone-acetaminophen combination pill six (6)

25

times per day as treatment.  However, despite regularly taking her prescription medication for migraines, her migraines persist and, in fact, have grown so severe that she now visits the ER several times per month in order to treat the pain she experiences as a result of her migraines.  In fact, when Plaintiff visits the ER, she is usually given an intravenous dose of Dilaudid, along with anti-nausea medication.

165.    Plaintiff's neurologist recently increased her prescription for carbamazepine, which she is now required to take two (2) times a day to help treat migraines and epilepsy.

166.    Given Plaintiff's extensive number of trips to the ER and expensive monthly prescription medication costs, Plaintiff was recently forced to declare bankruptcy due to her inability to pay the mounting medical bills she incurred since being implanted with Essure®.

167.    Plaintiff Edwards recalls being given an Essure® brochure by Dr.  Hensley.  She recalls this brochure being in colored-print and containing pictures of the Essure® coils in place in the fallopian tubes.  Additionally, Plaintiff recalls the brochure's front cover reading, "What is Essure?"  Further, she recalls the brochure promoting Essure® for its permanency and the fact that it required no surgery or anesthesia, which for Plaintiff Edwards was the biggest selling point.  As a result of undergoing the Essure® procedure, Plaintiff now suffers severe menstrual and abdominal pain, depression, fatigue, severe migraines, and pain during intercourse, which results in her bleeding for up to a week after intercourse.  Additionally, since being implanted with Essure®, Plaintiff has been forced to visit the ER several times a months.  Plaintiff has been prescribed a number of prescription medications, including Zoloft, Provera, Hydrocodone, Acetaminophen, and Carbamazepine.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff Kessha Edwards would not have chosen to

undergo the implantation of Essure® had she not relied on Defendants' misrepresentations as to the safety and effectiveness of Essure® as a form of permanent birth control.

### 2.    Christopher Edwards

168.    Plaintiff Christopher Edwards is a resident of Florrisant, Missouri.

169.    Plaintiff is married to Plaintiff Kessha Edwards and has suffered a loss of consortium as a result of his wife's injuries.

170.    Plaintiff's relationship with his wife began to change shortly after she underwent the implantation of Essure®.  Prior to being implanted with Essure®, Plaintiff's wife was outgoing, independent, loving and family-centered.  However, after undergoing the Essure® procedure Plaintiff's wife's personality changed drastically as she is now depressed, emotional and short-tempered.

171.    Additionally, the couple's level of sexual intimacy has sharply declined since Plaintiff's wife was implanted with Essure®.  Plaintiff's wife no longer initiates sexual intimacy as she now suffers pain during intercourse, which is followed by several days of bleeding.  As such, Plaintiff's relationship with his wife has been adversely affected by Essure®.

172.    Since being implanted with Essure®, Plaintiff's wife can no long drive due to her lack of alertness caused by the medications she is prescribed to treat her Essure®-related pain.  Additionally, as a further result of her medicated state, Plaintiff's wife is no longer as capable of caring for the couple's three children (ages 5, 8, and 10) as she was prior to undergoing the implantation of Essure®.  Plaintiff is now largely responsible for taking care of their children.  Further, Plaintiff reports that most of their family activities, such as fishing, have ceased entirely in the months following his wife's Essure® procedure.

173.    Plaintiff has also missed time from work while accompanying his wife to her numerous trips to the emergency room.  Additionally, Plaintiff sometimes stays overnight in the hospital with his wife and is too fatigued to work at his full capacity.  As a result, Plaintiff, who currently works in manufacturing, is seeking a different type of employment that would allow him a more flexible schedule so as to better accommodate his wife's needs.

174.    As a result of the foregoing, Plaintiff has been damaged by his wife's loss of consortium, and continues to be damaged as a result of her injuries.

### 3.    Mary Mikel

175.    Plaintiff Mary Mikel is a resident of Columbia, Missouri.

176.    On or around August 13, 2013, Plaintiff Mikel underwent the Essure® procedure performed by Dr. Lisa Brennaman at the University of Missouri Women and Children's Hospital located in Columbia, Missouri.

177.    Shortly after undergoing the Essure® procedure, Plaintiff began suffering severe menstrual, abdominal and back pain.

178.    Further, after being implanted with Essure®, Plaintiff also began suffering from depression and fatigue.

179.    Additionally, Plaintiff also suffered from heavy bleeding and pain during intercourse as a result of being implanted with Essure®.

180.    Plaintiff's pain resulting from her Essure®-related injuries grew so severe that Plaintiff's physicians prescribed her 800mg Ibuprofen and Vicodin.

181.    On or around January 22, 2014, Plaintiff Mikel underwent a partial hysterectomy, also performed by Dr. Lisa Brennaman at the University of Missouri Women and Children's Hospital located in Columbia, Missouri.

28

182.    While Plaintiff Mikel underwent a hysterectomy in January 2014, it was not until March 2016, when Plaintiff saw a television commercial about Essure® that she first suspected that her Essure® devices had caused her injuries.  As a result, the statute of limitations for her claim has been tolled because Plaintiff did not or should not have known that the Essure® was the cause of her injuries until she saw the television commercial in March 2016.

183.    Plaintiff Mikel recalls reviewing a brochure for Essure® that promoted Essure® as a safe and effective form of permanent birth control.  As such, Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result of being implanted with Essure®, Plaintiff suffered from severe abdominal, menstrual, and back pain, as well as depression, fatigue, heavy bleeding and pain during intercourse.  Moreover, Plaintiff was required to undergo the surgical removal of her Essure® coils through a partial hysterectomy due to her symptoms.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of the device.

F.    **NEW MEXICO**

1.    **Jessica Padilla**

184.    Plaintiff Jessica Padilla is a resident of Taos, New Mexico.

185.    In or around July 2005, Plaintiff Jessica Padilla underwent the implantation of Essure® performed by Dr. Reznick at Holy Cross Hospital, which is located in Taos, New

Mexico.  While Plaintiff Padilla originally sought to undergo a tubal ligation, Dr. Reznick recommended that she, instead, undergo the Essure® procedure.

186.     Shortly after undergoing the implantation of Essure®, Plaintiff began to suffer severe menstrual, abdominal, and back pain.

187.     Additionally, Plaintiff also began to suffer from depression and fatigue as a further result of being implanted with Essure®.

188.     Moreover, Plaintiff also began experiencing heavy bleeding and pain during intercourse after undergoing the implantation of Essure®.

189.     Dr. Moore of the Women's Health Institute in Taos, New Mexico, was the first physician to inform Plaintiff that her symptoms were likely caused by Essure®.  As such, it was not until sometime in 2015, when Dr. Moore first informed Plaintiff of the possible connection between Essure® and her symptoms.

190.     Plaintiff Padilla is currently scheduled for removal of her Essure®, which will be performed by Dr. Eve Espey at the University of New Mexico Hospital located in Albuquerque, New Mexico.

191.     Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.

G.     **TENNESSEE**

   1.     **Melanie Brooks**

192.     Plaintiff Melanie Brooks is a resident of Ashland City, Tennessee.

193.     In or around August 2012, Plaintiff Brooks underwent the Essure® procedure performed by Dr. Susan Mackey at the offices of Women's Medical Associates of Nashville.

194.    Shortly after undergoing the implantation of Essure® Plaintiff began suffering severe menstrual, abdominal and back pain.

195.    Further, after being implanted with Essure® Plaintiff Brooks began to experience symptoms of depression and fatigue, which resulted in her being prescribed Zoloft.  Plaintiff was able to cease taking Zoloft after her Essure® devices were removed.

196.    After undergoing the implantation of Essure®, Plaintiff began to suffer pain during intercourse, heavy bleeding and weight fluctuations.

197.    Moreover, Plaintiff has been diagnosed with an allergy to Nickel—the exact type of metal from which Essure® is manufactured.

198.    Plaintiff was prescribed Hydrocodone and Oxycodone to treat the chronic pain she suffered after being implanted with Essure®.  In December 2012, Plaintiff's pain grew so severe that she began needing to take these medications on a daily basis.

199.    In 2013, Plaintiff Brooks was given an antinuclear antibody ("ANA") test, for which she tested positive.[1]  She also suffers from hair loss and constant pain.

200.    On or around May 1, 2014, Plaintiff underwent a hysterectomy, performed by Dr. Sue McGuire at TriStar Summit Medical Center located in Hermitage, Tennessee.

201.    Plaintiff felt almost instant relief after undergoing a hysterectomy to have her Essure® removed.  As such, after Plaintiff's hysterectomy, she had more energy and she no longer experienced abdominal pain or pain during intercourse.  Accordingly, Plaintiff feels as though her life was changed for the better after undergoing a hysterectomy to have her Essure® removed.

---

[1]  The antinuclear antibody ("ANA") test is used as a primary test to help evaluate a person for autoimmune disorders that affect many tissues and organs throughout the body, such as lupus or rheumatoid arthritis.

202.    Further, at Plaintiff's six (6) week post-hysterectomy check-up, Dr. McGuire informed her that the problems Plaintiff had been suffering with her uterus were likely caused by complications with her Essure®.

203.    Additionally, sometime around October 2014, Plaintiff was diagnosed with fibromyalgia by Dr. Lagrone, who informed her that the onset of fibromyalgia could be related to a traumatic event such as the complications she experienced with Essure® or her hysterectomy.[2]

204.    Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.

**2.    Kyle Brooks**

205.    Plaintiff Kyle Brooks is a resident of Ashland City, Tennessee.

206.    Plaintiff Kyle Brooks is married to Melanie Brooks and has suffered a loss of consortium as a result of his wife's Essure®-related injuries.

207.    Shortly after Plaintiff's wife was implanted with Essure®, Plaintiff noticed that she seemed more irritable and tired, which was unusual as she was always active and energetic prior to being implanted with Essure®.

208.    Additionally, whereas prior to his wife's Essure® procedure the couple evenly divided household chores, after the procedure he became responsible for all household chores.

209.    Further, the couple's level of sexual intimacy sharply declined as Melanie began suffering pain during intercourse.  In fact, her pain during intercourse was so severe it would cause her to cry.

---

[2] Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory, and mood issues.  Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress.

210.     Moreover, Plaintiff's wife could no longer care for or play with their children due to her Essure®-related injuries.  As such, Plaintiff has had to serve as the primary caretaker of their children, including their infant daughter.

211.     Plaintiff's relationship with his wife was adversely affected after she underwent the Essure® procedure.  He has suffered damages for the loss of his wife's care, comfort, society, love, and friendship, and he continues to suffer damages.

**H.    TEXAS**

**1.    Lachadra McGee**

212.     Plaintiff Lachadra McGee is a resident of Houston, Texas.

213.     In or around October 2012, Plaintiff McGee underwent the Essure® procedure twice performed by Dr. Martinez.  The first placement procedure was unsuccessful.  The second placement was successful.

214.     Shortly after undergoing these two Essure® procedures Plaintiff began to suffer severe menstrual, abdominal and back pain.

215.     Plaintiff also began to experience symptoms of depression and fatigue.  In July 2013, Plaintiff was prescribed a variety of psychiatric medications, including Welbutrin XL, Xanax, Remeron, and Ambien.

216.     Further, after undergoing the implantation of Essure® Plaintiff also began suffering heavy bleeding and pain during intercourse.  Plaintiff also experienced bloating immediately after being implanted with Essure® and gained approximately thirty (30) pounds.

217.     When Plaintiff first inquired with her doctor as to the issues she was experiencing after being implanted with Essure®, the physician merely told Plaintiff that it could take her body up to six (6) weeks post-procedure to adjust to her new Essure® device.

218.     On or around November 17, 2014, Plaintiff underwent a partial hysterectomy performed by Dr. Stacey James.  During this procedure, Plaintiff's fallopian tubes, uterus, and Essure® coils were removed; however, her ovaries were kept intact.  Additionally, Plaintiff recalls being informed that her uterus and fallopian tubes were inflamed.

219.     Plaintiff recalls experiencing immediate relief after undergoing her hysterectomy as she no longer suffered back pain, migraines, and pain during intercourse.

220.     Additionally, Plaintiff recalls originally seeking to have a tubal ligation performed prior to being implanted with Essure®.  However, while Plaintiff was in the hospital awaiting surgery, the implanting physician told Plaintiff that she was going to implant Essure® in Plaintiff rather than performing the planned tubal ligation.  Accordingly, Plaintiff felt as though she had no choice but to undergo the implantation of Essure®.

221.     Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.

**2.     Gina Davis**

222.     Plaintiff Gina Davis is a resident of Rosenberg, Texas.

223.     On or around January 30, 2013, Plaintiff underwent the Essure® procedure performed by Dr. Adaiah Ezekiel at the Hope Women's Clinic located in Richmond, Texas.

224.     Shortly after undergoing the implantation of Essure®, Plaintiff began to suffer severe menstrual and abdominal pain.

225.     Additionally, Plaintiff also began to suffer from depression and fatigue as a further result of being implanted with Essure®.

226.     Plaintiff began experiencing pain during intercourse and began to suffer severe migraines—for which she had no prior history of suffering prior to being implanted with

34

Essure®.  Plaintiff's migraines became so severe that she visited the ER twice and was subsequently prescribed Tramadol and Hydrocodone.

227.    In or around October 2015, Plaintiff asked her doctor about removing her Essure®.  However, Plaintiff's doctors have so far refused to remove the devices.

228.    Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.

**3.    Afden Acosta**

229.    Plaintiff Afden Acosta is a resident of Beaumont, Texas.

230.    In or around April 2015, Plaintiff underwent the Essure® procedure performed by Dr. Maxie Sprott in her offices located in Beaumont, Texas.

231.    Shortly after undergoing the implantation of Essure®, Plaintiff began to suffer severe menstrual, abdominal, and back pain.

232.    Additionally, Plaintiff also began to suffer from depression and fatigue as a further result of being implanted with Essure®.

233.    Plaintiff also began experiencing weight fluctuations, heavy bleeding and pain during intercourse after undergoing the implantation of Essure®.

234.    Further, Plaintiff began to suffer severe migraines—for which she had no prior history of suffering prior to being implanted with Essure®.

235.    Plaintiff's pain resulting from her Essure®-related injuries became so severe that she was prescribed Lorcet.

236.    Plaintiff recalls reviewing a brochure for Essure®, which promoted Essure® as a safe and effective form of permanent birth control.  As such, Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and,

based thereon, decided to undergo the implantation of Essure®.  As a result of being implanted

with Essure®, Plaintiff now suffers from severe abdominal, menstrual, and back pain, as well as

depression, fatigue, heavy bleeding, migraines, and pain during intercourse.  Moreover, Plaintiff

may have to undergo a hysterectomy to have her Essure® removed.  Plaintiff relied to her

detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff would not have

chosen to undergo the implantation of Essure® had she not relied on Defendants'

misrepresentations in the Essure® brochure as to the safety and effectiveness of the device.

**4.     Danielle Wright**

237.    Plaintiff Danielle Wright is a resident of Fort Worth, Texas.

238.    On or around December 19, 2014, Plaintiff Wright underwent the Essure®

procedure at Baylor Surgical Hospital located in Fort Worth, Texas.

239.    After having the Essure® device implanted for more than 3 months, Plaintiff

Wright learned that she was pregnant.

240.    In addition to her pregnancy, Plaintiff Wright has also suffered severe menstrual

pain, severe abdominal pain, and severe back pain.  In order to treat this severe pain Plaintiff

Wright has been prescribed pain medication.

241.    Ever since receiving Essure® Plaintiff has suffered from depression and fatigue.

242.    Additionally, since undergoing the Essure® procedure, Plaintiff has suffered

heavy bleeding.

243.    Since experiencing such symptoms, Plaintiff Wright has been informed by her

physician, Dr. Maxwell, that her symptoms are most likely related to Essure®.

244.    Plaintiff relied to her detriment on Defendants' misrepresentations concerning

Essure®.

**5.     Francesca Olivarri**

245.     Plaintiff Francesca Olivarri is a resident of Atascosa, Texas.

246.     In or around March 2009, Plaintiff underwent the Essure® procedure.

247.     Shortly after undergoing the implantation of Essure®, Plaintiff began to suffer severe menstrual, abdominal, and back pain.

248.     Plaintiff also began to suffer from depression and fatigue as a further result of being implanted with Essure®.

249.     Plaintiff suffers from heavy bleeding and pain during intercourse since undergoing the implantation of Essure®.

250.     Further, after being implanted with Essure® Plaintiff began to suffer severe migraines—for which she had no prior history of suffering prior to being implanted with Essure®.

251.     Plaintiff's pain caused by her Essure®-injuries became so severe that she was prescribed pain medication.

252.     Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.


**I**.     **CALIFORNIA**

**1.     Jacoba Ogg**

253.     Plaintiff Jacoba Ogg is a resident of Apple Valley, California.

254.     On or around July 31, 2012, Plaintiff Jacoba Ogg underwent the Essure® procedure performed by Dr. Jerry Tsai at Kaiser Permanente Fontana Medical Center located in Fontana, California.

255.     Shortly after undergoing the implantation of Essure®, Plaintiff began to suffer severe menstrual, abdominal, and back pain.

256.     Plaintiff also began to suffer from depression and fatigue as a further result of being implanted with Essure®.

257.     Moreover, Plaintiff also began experiencing heavy bleeding, weight fluctuations, and pain during intercourse.

258.     Further, after being implanted with Essure® Plaintiff began to suffer severe migraines—for which she had no prior history of suffering prior to being implanted with Essure®.

259.     As such, Plaintiff is scheduled to undergo a hysterectomy on July 13, 2016, to have her Essure® removed.

260.     Plaintiff recalls reviewing a brochure for Essure®, which promoted Essure® as a safe and effective form of permanent birth control.  As such, Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result of being implanted with Essure®, Plaintiff now suffers from severe abdominal, menstrual, and back pain, as well as depression, fatigue, heavy bleeding, migraines, and pain during intercourse.  Moreover, Plaintiff may have to undergo a hysterectomy to have her Essure® removed.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of the device.

**2.     Emily Greenhill**

261.     Plaintiff Emily Greenhill is a resident of Apple Valley, California.

262.    In or around October 2013, Plaintiff underwent the Essure® procedure performed by Dr. Reza Ahmadinia at St. Mary Medical Center located in Apple Valley, California.

263.    Shortly after undergoing the implantation of Essure®, Plaintiff began to suffer severe menstrual and abdominal pain.

264.    Plaintiff also began to suffer from depression and fatigue as a further result of being implanted with Essure®.  As such, she has been prescribed Ativan to treat her anxiety, which she was diagnosed with prior to undergoing the Essure® procedure, but that has become more severe after the procedure.

265.    Plaintiff also experienced weight fluctuations, heavy bleeding and pain during intercourse after undergoing the implantation of Essure®.

266.    Further, after being implanted with Essure® Plaintiff began to suffer severe migraines—for which she had no prior history of suffering prior to being implanted with Essure®.

267.    Plaintiff recalls reviewing a brochure for Essure®, which promoted Essure® as a safe and effective form of permanent birth control.  As such, Plaintiff relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of Essure® and, based thereon, decided to undergo the implantation of Essure®.  As a result of being implanted with Essure®, Plaintiff now suffers from severe abdominal, and menstrual pain, as well as depression, fatigue, heavy bleeding, migraines, and pain during intercourse.  Moreover, Plaintiff may have to undergo the surgical removal of her Essure® device.  Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.  Plaintiff would not have chosen to undergo the implantation of Essure® had she not relied on Defendants' misrepresentations in the Essure® brochure as to the safety and effectiveness of the device.

### 3.  Dori Martinez

268.    Plaintiff Dori Martinez is a resident of Stockton, California.

269.    In or around 2003 Plaintiff Martinez underwent the Essure® procedure as a clinical trial participant.

270.    Shortly after undergoing the implantation of Essure®, Plaintiff began to suffer severe menstrual, abdominal and back pain.

271.    Plaintiff also began to suffer from depression and fatigue as a further result of being implanted with Essure®.

272.    After being implanted with Essure® Plaintiff was also diagnosed as having an allergy to Nickel—the exact metal from which Essure® is manufactured.

273.    Plaintiff was diagnosed with chronic fatigue immune disorder[3] and fibromyalgia[4] after undergoing the implantation of Essure®.

274.    Plaintiff also began experiencing heavy bleeding and pain during intercourse after undergoing the implantation of Essure®.

275.    After being implanted with Essure® Plaintiff also began to suffer severe migraines—for which she had no prior history of suffering prior to being implanted with Essure®.

276.    Plaintiff's chronic pain resulting from her Essure®-related injuries grew so severe that she was prescribed pain medication to treat it.

---

[3] Chronic fatigue immune disorder is a complicated disorder characterized by extreme fatigue that cannot be explained by any underlying medical condition.  The fatigue may worsen with physical or mental activity, but does not improve with rest.
[4] Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory, and mood issues.  Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress.

277.    Plaintiff is scheduled to have her Essure® surgically removed on June 2, 2016.

278.    Plaintiff relied to her detriment on Defendants' misrepresentations concerning Essure®.

**IV**

**FACTUAL BACKGROUND**

**A.    WHAT IS ESSURE?**

279.    Essure® is promoted as a fast and permanent form of non-surgical birth control that is threaded through the vaginal opening and inserted into a patient's fallopian tubes.

280.    As a method of birth control, Essure® functions by causing bilateral occlusion of the fallopian tubes – a blockage of the fallopian tubes in order to prevent sperm from fertilizing the patient's eggs.

281.    The Essure® product consists of an introducer, delivery catheter, and two micro-inserts.

282.    The Essure® micro-inserts are small spring-like devices composed of a stainless steel inner coil, a nickel titanium (Nitinol) expanding outer coil, and polyethylene terephthalate (PET) fibers, which are wound in and around the inner coil.



283.     During the Essure® placement procedure, while using an hysteroscope, the physician inserts the Essure® micro-inserts through the patient's vagina, cervix, uterus and ultimately implants the micro-inserts into the patient's fallopian tubes, "where [the device] elicits an inflammatory reaction and response which, over time, leads to occlusion of the fallopian tubes by tissue ingrowth."



284.     Essure® begins to function as birth control once the scar tissue forms around the implanted Essure® micro-inserts, thus creating an occlusion of the fallopian tubes that sperm cannot penetrate.

285.     For three months following insertion of the devices, patients are warned that another form of birth control is necessary to prevent pregnancy because it takes approximately that amount of time for scar tissue to form around the Essure® implants.

286.     After three months, a dye is injected into the patient's uterus and then the doctor performs a hysterosalpingogram ("HSG"), which is a special x-ray procedure that confirms that the patient's fallopian tubes are indeed blocked or occluded.  Once the results of the HSG have confirmed that the patient's fallopian tubes are successfully blocked by Essure®, the patient is advised to cease using alternative forms of birth control.

B.     **REGULATORY BACKGROUND**

287.    Essure® was originally designed and manufactured by Conceptus, Inc. ("Conceptus"), which was acquired by Defendant Bayer AG, on or around April 28, 2013, and is now wholly-owned by Bayer.  Accordingly, for purposes of this lawsuit, Conceptus and Defendants are one and the same and will be referred to collectively as "Defendants" throughout the remainder of the Complaint.

288.    Essure® is a Class III medical device that is now manufactured, sold, distributed, marketed, and promoted by Defendants.

289.    Defendants trained physicians on how to use the Essure® device and other hysteroscopic equipment.

290.    Prior to the sale of Conceptus to Defendant Bayer AG, Conceptus applied for and was granted Conditional Premarket Approval ("CPMA") for Essure® by the FDA, subject to a number of conditions.

291.    Premarket Approval ("PMA") is the FDA process of scientific and regulatory review in evaluating the safety and effectiveness of Class III medical devices.  According to the FDA, Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present unreasonable risk of illness or injury.  As such, Premarket Approval grants the applicant permission to market the device.

292.    According to FDA regulations, the agency is provided 180 days to review the PMA submission and to make its determination as to whether to grant permission to market the device.  Prior to approving or denying PMA, the appropriate advisory committee may review the PMA submission at a public meeting and provide the FDA with its recommendations on whether the FDA should approve the submission in question.

293.     Accordingly, a Class III device that fails to meet the requirements for CPMA is considered an adulterated device under section 501(f) of the Federal Food, Drug, and Cosmetic Act ("FDCA") and as such, cannot be marketed.

294.     During the Premarket Approval Process, devices can either be "approved," "conditionally approved," or "not approved."

295.     On November 4, 2002, the Essure™ System was only "conditionally approved," as evidenced in the conditions set forth in the premarket approval order for Essure®.

296.     The FDA stated in the CPMA Order for Essure® that "[f]ailure to comply with the conditions of approval invalidates this approval order."

297.     The FDA's CPMA Order placed the following conditions on its approval of Essure®:

    a.   Annual follow-ups with the women who participated in the Phase II and Pivotal clinic trials are to be submitted **annually for 5 years**, "[i]n order to gather long-term safety and effectiveness data on the Essure™ System";

    b.   **Post-approval study** in the U.S. with newly trained physicians reporting:

        1.   "rates of successful bilateral placement of the Essure™ System at first attempt"; and

        2.   "identification of factors predictive of failure to achieve bilateral placement of the Essure™ System at first attempt."

    c.   Adverse reaction or device defect reporting "**within 10 days** after the applicant receives or has knowledge of information;" and

d. "**[R]eport to the FDA** whenever [Conceptus] receives or otherwise become[s] aware of information, from any source, that reasonably suggests that a device marketed by the manufacturer":

    1. "**May have caused or contributed to a death or <u>serious injury</u>**"; or

    2. "Has **<u>malfunctioned</u>** and such device "would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."

298. Despite the fact that failure to comply with just one of these conditions would serve to invalidate the CPMA Order for Essure®, Defendants failed to comply with several of the conditions imposed by the order. Specifically:

i. Defendants **<u>failed to timely provide the FDA with reports</u>** after twelve months, eighteen months, and then a final report for one schedule. Additionally, all reports failed to meet their respective deadlines.

ii. Defendants failed to document successful implantation of Essure®, thus concealing the failure rates of Essure®.

iii. Defendants failed to notify the FDA of several adverse reactions and thus, actively concealed the same. As such, Defendants **<u>failed to report eight perforations</u>** that resulted from use of Essure® and were cited for the same by the FDA via Form 483.[5]

iv. Defendants also failed to report to the FDA information they received that reasonably suggested that the device may have caused or contributed to a serious injury, thus concealing such injuries. As mentioned above,

---

[5] Form 483 is issued to firm management at the conclusion of inspection when an FDA investigator has observed any conditions that violate the FDCA rendering the device "adulterated."

Defendants failed to report **eight perforations** caused by Essure® to the FDA as evidenced in Form 483.

v.   Defendants failed to provide the FDA with notice of their *internal* records consisting of **16,047 complaints** regarding Essure®.

vi.  Defendants' warranties were not truthful or accurate.

vii. Defendants' warranties were not consistent with applicable federal and state law.

299.   The CPMA also required Defendants to comply with sections 502(q) and (r) of the FDCA which prohibit offering Essure® "for sale in any State, if its advertising is false or misleading."

300.   As described below under "Facts and Warranties," Defendants violated both sections 502(q) and (r) by falsely and misleadingly advertising Essure® to Plaintiffs and their respective physicians.  Nevertheless, Defendants continued to sell Essure® with misleading and false advertising in further violation of the CPMA Order.

301.   According to the FDA, "a PMA may be sold to another company," but "the sponsor must submit a PMA amendment to notify the FDA of the new owner [stating] the effective date of ownership transfer; a statement of the new owner's commitment to comply with all conditions of approval applicable to the PMA; and either a statement that the new owner has a complete copy of the PMA including all amendments, supplements, and reports or a request for a copy from the FDA files."

302.   Accordingly, there were 36 PMA supplements filed with the FDA regarding Essure®.  However, **not one of these 36 PMA supplements included notification of the new owner, Defendant Bayer.**

46

303.    As such, (1) the CPMA is invalid per the FDA; (2) Essure® is considered an "adulterated" product that cannot be marketed or sold per the FDA given Defendants' numerous violations of conditions imposed in the CPMA order; and (3) the invalid CPMA was not properly transferred to Bayer and, thus, Defendants do not have a valid PMA for Essure®.

## C.    CLINICAL TRIALS

304.    As was set forth in the Summary of Safety and Effectiveness Data, the Center for Devices and Radiological Health ("CDRH") granted expedited review of the CPMA for Essure® because "it offers significant advantages over existing approved alternatives for permanent birth control.  Namely, the Essure™ System is delivered hysteroscopically without general anesthesia or an abdominal incision."

305.    Between November 1998 and June 2001, a total of 745 women underwent the Essure® placement procedure in two separate clinical investigations so as to evaluate the safety and effectiveness of the Essure™ System (227 in the Phase II study and 518 women in the Pivotal trial).

306.    Defendants reported to the FDA that the majority of women in *both* clinical trials "experienced moderate pain during and immediately following the procedure, and the majority of women experienced spotting for an average of 3 days after the procedure."

307.    However, Defendants reported to the FDA that after just one year following implantation of Essure®, approximately 4 percent of the women who participated in the clinical trials reported having abdominal pain and 9 percent reported back pain.

308.    When the FDA granted CPMA for Essure®, it was clear to state that the "data from these two clinical effectiveness studies are based on only 1-year and 2-year follow-up[s]."

47

As such, the FDA concluded that "[t]he risks of long term implantation are unknown.  This is of special significance with respect to pregnancy, including ectopic pregnancy."

309.    Accordingly, the FDA required a 5-year follow-up under the Phase II and Pivotal trials "[i]n order to gather long-term safety and effectiveness data on the Essure™ System. . ."

310.    In its CPMA Order, the FDA specifically required Conceptus "to follow participants who [were] relying on Essure® for contraception for both safety and effectiveness at 2, 3, 4, and 5 years after *discontinuation of alternative contraception*."

311.    Additionally, the FDA stated that the data collected should include pregnancies and outcomes; adverse events; and histological explant data following any extirpative surgeries.

312.    In the CPMA letter, the FDA concluded that when a five-year follow-up report was submitted, the agency would have to determine whether continued follow-up of these study subjects is required.

313.    Further, the FDA required Conceptus to submit three (3) copies of an Adverse Reaction Report or Device Defect Report to the PMA Document Mail Center within 10 days after it received or had knowledge of the information concerning any adverse reactions, side effects, injuries, toxicity, or sensitivity reaction attributable to the Essure® device.

314.    As of October 2013, there were only 943 complaints about Essure® to the FDA whereas 750,000 Essure® procedures had been performed worldwide at the time.

315.    The initial clinical trials that provided effectiveness and safety data, and upon which the CPMA relied were the "Phase II" trial and the larger "Pivotal" study.

316.    In the Phase II study, the following adverse or other events that delayed or prevented reliance on Essure® for contraception were initially reported:  perforation (2.9%);

48

expulsion (0.5%); other unsatisfactory micro-insert location (0.5%); and initial tubal patency (3.5%).  Additionally, during this study, 0.9% of women reported experiencing pain.

317.     In the Pivotal Trial, the following adverse or other events that delayed or prevented reliance on Essure® for contraception were initially reported:  perforation (1.1%); expulsion (2.9%); other unsatisfactory micro-insert location (0.6%); and initial tubal patency (3.5%).  Additionally, during this study 12.9% of women reported experiencing pain.

318.     However, the most frequently reported adverse events in the first year that did not prevent women from relying of Essure™ were back pain (9.0%), abdominal pain/cramps (3.8%) and dyspareunia (3.6%).

319.     Additionally, the FDA reported that while the following adverse events were not experienced by women who participated in clinical studies, they were still possible:

     i.   pregnancy, including ectopic pregnancy, in women relying on the Essure™ device;

     ii.   perforation of internal bodily structures other than the uterus and fallopian tube;

     iii.   adnexal infection/salpingitis;

     iv.   adverse events associated with the hysterosalpingogram (HSG) or x-rays;

     v.   the effect of future medical procedures that involve the uterus or fallopian tubes on the ability of the Essure™ micro-insert to provide protection against pregnancy;

     vi.   adverse events associated with surgery attempting to reverse the Essure™ procedure, as well as adverse events associated with pregnancy following a reversal procedure or an *in vitro* fertilization (IVF) procedure; and

vii. adverse events associated with gynecologic surgical procedures (e.g.,

endometrial ablation).

320.    In the FDA's Summary of Safety and Effectiveness Data, the perforations

experienced by women in the first year were explained as being caused by the "since-

discontinued support catheter," which is now no longer a part of the Essure™ System.

**D.    POST-MARKET SUREVEILLANCE**

321.    From 2013-2015, complaints to the FDA concerning Essure® jumped from 943 to

over 9,000.

322.    After examining safety concerns raised by patients and cited in the Medical

Device Reports ("MDR's") for Essure®, the FDA convened a meeting of the Obstetrics and

Gynecology Devices Panel of the Medical Devices Advisory Committee on September 24, 2015.

323.    During this meeting, the Committee was "asked to provide input regarding the

need for product labeling changes, the collection of additional post-market safety data, or other

mitigation steps, and the overall benefit-risk profile of the [Essure] device based on current

available information."

324.    The FDA's review of available information after the September 2015 Advisory

Committee Meeting resulted in the following:

i.    the FDA specifically ordered Bayer to conduct a postmarket surveillance

study to obtain more data about Essure's benefits and risks;

ii.    the FDA required that a boxed warning and Patient Decision Checklist be

added to Essure® product labels to ensure that a woman receives and

understands information regarding the benefits and risks of this type of device

prior to undergoing the Essure® procedure; and

50

iii. the FDA issued draft guidance, "Labeling for Permanent Hysteroscopically-Placed Tubal Implants Intended for Sterilization" to provide the public with an opportunity to comment on the proposed language to be included in these warnings.

325.    The FDA is also in the process of completing its evaluation of the trade complaint filed regarding allegations initially made in a Citizen Petition. The allegations include clinical trial misconduct, notably that **clinical trial participants' medical records were altered to reflect more favorable data on participants' experiences**, and that Defendants violated the terms of the PMA approval order and violated the laws that related to the manufacturing and marketing of Essure®.

326.    In fact, the FDA inspected Bayer as part of its ongoing complaint investigation and Bayer provided the FDA with available case report forms that documented patient experiences during Essure® clinical trials.

327.    During the FDA's inspection of Bayer, it allegedly found that less than 1% of case report form data pertaining to pain, bleeding, device placement/movement and pregnancy were changed during the clinical trials.[6]

328.    Bayer must now follow a post-market surveillance study protocol, which must be submitted within 30 days of the FDA's announcement and the study must begin within 15 months of the protocol being determined. The **FDA is requiring Bayer to follow at least 2,000**

---

[6] However, according to Defendants' own statement made in response to the FDA requiring post-market surveillance of Essure®, "[a]lthough modifications to the case report forms were identified, the FDA's analysis did not find evidence that the sponsor purposefully modified patient responses to reflect more favorable data for Essure." Thus, indicating that at least some modifications were indeed made to case report forms during the clinical trials.

**women for at least 3 years in order to determine the risks of general tubal ligation versus Essure**®.  Additionally, Bayer is required to provide interim reports.

329.    Although **Bayer claimed to have only 943 complaints about Essure**® **as of 2013**, the database for Manufacturer and User Facility Device Experience ("MAUDE"), as maintained by the FDA, paints a very different picture.

330.    In fact, according to the FDA, there have been approximately **9,900 complaints** from November 4, 2002, through December 31, 2015.  The most common complaints were as follows: abdominal pain (6,989); heavier or irregular periods (3,210); headaches (2,990); fatigue (2,159); and weight fluctuations (2,088).

331.    The most frequent device problems reported were: patient-device incompatibility[7] (2,016); migration of the device or device component (854); device operating differently than expected (490); device breakage (429); device difficult to remove (280); malposition of the device (199); and device difficult to insert (187).

332.    Further, there have been 32 reports coded by the submitter as resulting in death.  Of these 32 complaints, six appear to have been incorrectly coded, as there was no indications of death in the report.  Of the remaining 26 complaints, six related to **four adult deaths**; 18 reports related to **15 incidents of pregnancy loss**; and two reports related to **two incidents of a death of an infant after live birth**.

333.    Additionally, the FDA has received **631 reports of pregnancies** in patients with Essure®.  Of these, **150 were reported to have resulted in a live birth**, 204 did not indicate

---

[7] For example, a patient being allergic to nickel.  Although, during the FDA panel on Obstetrics and Gynecology Devices, it was discussed that further studies were needed to determine the prevalence of such reactions.

whether the pregnancy resulted in a live birth or pregnancy loss; and **294 resulted in pregnancy loss**.

334.    Among the 294 reports of women who experienced a pregnancy loss, **96 were reported as ectopic pregnancies**; 43 were reported as elective terminations of pregnancies, and 155 were other pregnancy losses.

## E.    FAILURE TO ADEQUATELY TRAIN PHYSICIANS

335.    Upon information and belief, Plaintiffs allege that Defendants (1) failed to adequately train implanting physicians on how to use the Essure® delivery system; (2) provided specialized hysteroscopic equipment manufactured by a third party; and (3) created an unreasonably dangerous distribution plan, all of which were aimed at capitalizing on and monopolizing the birth control market at the expense of Plaintiffs' safety and well-being.

336.    Because Essure® was the first device of its kind, the implanting physicians were trained by Defendants on how to properly insert the micro-inserts using the disposable delivery system and were given hysteroscopic equipment by Defendants.

337.    In fact, to capture the market, Defendants independently undertook a duty of training physicians, including the implanting physicians, on how to properly use (1) its own mechanism of delivery, and (2) the specialized hysteroscopic equipment manufactured by a third party.

338.    As to Essure®, Defendants' Senior Director of Global Professional Education stated, "training is the key factor when clinicians choose a new procedure" and "[f]or the Essure® procedure, the patient is not under anesthesia, therefore a skilled approach is crucial."

339.    In fact, because gynecologists and Plaintiffs' implanting physicians were unfamiliar with the device and how to deliver it, Defendants (1) created a "Physician Training

Manual"; (2) created a simulator called EssureSim; (3) organized limited training courses—where Defendants observed physicians until Defendants believed they were competent; (4) created Essure® Procedure Equipment Supplies Checklists; and (5) represented to Plaintiffs that "Physicians must be signed-off to perform Essure® procedures."

340.    Defendants provided no training to the implanting physicians on how to *remove* Essure® should it migrate.

341.    Defendants also kept training records on all physicians "signed-off to perform Essure® procedures."

342.    In order to sell its product, and because the implanting physicians did not have access to the expensive hysteroscopic equipment, Defendants provided the implanting physicians with hysteroscopic equipment which, although not part of Essure®, is necessary for implanting Essure®.  As such, the entrustment of this equipment is not part of any CPMA.

343.    Defendants entered into agreements with Johnson & Johnson Co., Olympus America, Inc., Richard Wolf Medical Instruments Corp., and Karl Storz Endoscopy, America, Inc., (1) to obtain specialized hysteroscopic equipment to then give to physicians and (2) to increase its sales force to promote Essure®.

344.    According to Defendants, these agreements allowed Defendants to "gain market presence . . . and expand . . . market opportunity by driving adoption among a group of physicians."

345.    In regard to the entrustment of such specialized equipment, Defendants admitted: "We cannot be certain how successful these programs will be, if at all."

346.    Defendants handed out this equipment to unqualified physicians, including Plaintiffs' implanting physicians, in their effort to sell Essure®.

347.    Defendants knew or failed to recognize that the implanting physician was not qualified to use such specialized equipment, yet provided the equipment to the unqualified implanting physician in order to capture the market.

348.    In return for providing the hysteroscopic equipment, Defendants required that the implanting physicians purchase two Essure® "kits" per month.  Accordingly, this was part of Defendants' unreasonably dangerous and negligent distribution plan aimed solely at capturing market share with reckless disregard for the safety of the public and Plaintiffs.

349.    Defendants' distribution plan included requiring implanting physicians to purchase two Essure® "kits" per month, regardless of whether he or she used them.  This distribution plan created an environment which induced the implanting physicians to "push" Essure® and implant the same into Plaintiffs.

350.    Accordingly, Defendants used the expensive hysteroscopic equipment to induce the implanting physicians into an agreement as "bait."  Once the implanting physicians "took the bait," they were required to purchase two Essure® "kits" per month, regardless of whether the physician sold any Essure® "kits."

351.    This was an unreasonably dangerous distribution scheme as it compelled implanting physicians to sell two devices per month at the expense of Plaintiffs' health, safety, and well-being.

352.    Defendants' distribution plan also included (1) negligently distributing Essure® against FDA orders and sections 501(f), 502(q) and (r) of the FDCA by marketing and selling an adulterated product; (2) the promotion of Essure® through representatives of the hysteroscopic equipment manufacturers, who were neither adequately trained nor had sufficient knowledge regarding Essure®; (3) failing to report and actively concealing eight perforations which occurred

as a result of Essure®; (4) erroneously using non-conforming material in the manufacturing of Essure®; (5) failing to use pre-sterile and post-sterile cages; (6) manufacturing Essure® at an unlicensed facility; and (7) manufacturing Essure® for three years without license to do so.

353.   Defendants failed to adequately train the physicians on how to use their delivery system and the hysteroscopic equipment manufactured by a third party, provided specialized hysteroscopic equipment to implanting physicians who were not qualified to use the same, and created an unreasonably dangerous distribution plan, all of which were aimed at capitalizing and monopolizing the birth control market.

354.   Defendants negligently trained physicians, including the Plaintiffs' implanting physicians on how to properly and safely use its hysteroscopic equipment while performing Essure® procedures.

355.   The skills needed to place the micro-inserts, as recognized by the FDA panel, "are way beyond the usual gynecologist."  Specifically, Dr. Cindy Basinki stated while presenting to the panel, "optimal patient outcomes with either laparoscopic or hysteroscopic permanent contraception is premised on the underlying skills of the physician, and the value of good hysteroscopic skills is an important aspect of the Essure® procedure."[8]

356.   A key study found that a learning curve for this hysteroscopic procedure was seen for procedure time, but not for successful placement, pain, and complication rates, evidencing that Defendants' training methods were failing.[9]

---

[8] Dr. Cindy Basinki, M.D., FACOG, FPMRS, is a private practitioner, educator and researcher who presented at the FDA's Obstetrics and Gynecology Devices Panel.  During her presentation, Dr. Basinki addressed the importance of implanting physicians possessing good hysteroscopic skills when performing the Essure® procedure.
[9] *Learning curve of hysteroscopic placement of tubal serilization micro inserts*, U.S. National Library of Medicine, Janse, JA.

357.    Defendants provided hysteroscopic equipment to implanting physicians who were not competently trained to use such a device.  Defendants knew the implanting physicians were not competently trained to use such sophisticated equipment but yet provided the equipment to them anyway in order to sell Essure® at a higher volume.

## F.    WEBSITE WARRANTIES

358.    Plaintiffs relied on the following warranties by Defendants and/or its agents, as outlined in the subsequent paragraphs.

359.    Defendant Bayer Healthcare Pharmaceuticals, Inc., marketed on its website the following false or misleading representations:

      i.    "Only FDA approved female sterilization procedure to have **zero pregnancies** in the clinical trials."

          o    In fact, there were actually **four pregnancies during the clinical trials and five pregnancies during the first year of commercial experience**.  Defendants concealed this information from Plaintiffs.

     ii.    "Physicians must be signed-off to perform Essure® procedures."

          o    In fact, Defendants failed to adequately train the implanting physicians and "signed-off" on the implanting physicians who did not have the requisite training.[10]  Defendants concealed this information from Plaintiffs.

///

///

---

[10] In fact, during the FDA Panel on Obstetrics and Gynecology Devices, it was suggested that there be "some type of proficiency assessment" for implanting physicians to undergo prior to performing Essure® procedures.

iii. "Surgery-free"

- o In fact, Essure® is not "surgery-free".  All Essure® procedures are done under hysteroscopy, which is a surgical procedure.

iv. "Worry free:  Once your doctor confirms that your tubes are blocked, you never have to worry about unplanned pregnancy"

- o In fact, **several pregnancies have been reported** subsequent to confirmation.  Defendants concealed this information from Plaintiffs.

- o Between 1997 and 2005, **64 pregnancies were reported** to Defendants.  Defendants concealed this information from Plaintiffs.

- o Adverse Event Report ESS 205, dated 10/3/2006, evidences a pregnancy after the three month Confirmation Test was confirmed.  Defendants concealed this information from Plaintiffs.

- o There have been over **30 pregnancies** **after "doctors confirmed the tubes were blocked**."

- o Women who have Essure® have a **10 times greater risk of pregnancy after one year** than those who use laparoscopic sterilization.  At ten years, the risk of pregnancy is almost four times greater.[11]

v. "Essure® is the most effective permanent birth control available, even more effective than tying your tubes or a vasectomy."

- o In fact, Defendants' SEC filings, Form 10-k, show that no comparison to a vasectomy or tying of tubes was ever done by Defendants.

---

[11] *Probability of pregnancy after sterilization: a comparison of hysteroscopic versus laparoscopic sterilization,* Gariepy, Aileen. Medical Publication "Contraception." Elsevier 2014.

Defendants stated, "We did not conduct a clinical trial to compare the Essure® procedure to laparoscopic tubal ligation."  Defendants concealed this information from Plaintiffs.

     o  And women who have Essure® have a 10 times greater risk of pregnancy after one year than those who use laparoscopic sterilization. At ten years, the risk of pregnancy is almost 4 times greater.[12]

vi.  "Correct placement . . . is performed easily because of the design of the micro-insert."

     o  In fact, Defendants admitted that placement of the device requires a "skilled approach" and even admitted that **their own experts in hysteroscopy** (as compared to general gynecologists not on the same level as an expert hysteroscopist) **failed to place the micro-inserts in 1 out of 7 clinical participants**.  Defendants concealed this information from Plaintiffs.

vii. "An Essure® trained doctor inserts spring-like coils, called micro-inserts . . . .

     o  In fact, the implanting physicians who implanted the devices were not adequately trained.  Defendants concealed this information from Plaintiffs.

viii.  "The Essure® training program is a comprehensive course designed to provide information and skills necessary to select appropriate patients, perform competent procedures and manage technical issues related to the placement of Essure® micro-inserts for permanent birth control."

---

[12] *Id.*

      ○  In fact, Defendants failed to adequately train the implanting physician. Defendants concealed this information from Plaintiffs.

ix. "In order to be trained in Essure® you must be a skilled operative hysteroscopist.  You will find the procedures easier to learn if you are already proficient in operative hysteroscopy and management of the awake patient.  If your skills are minimal or out of date, you should attend a hysteroscopy course before learning Essure."

      ○  In fact, Defendants "signed off" on implanting physicians who were not skilled operative hysteroscopists in order to capture and monopolize the market, including the implanting physicians. Defendants concealed this information from Plaintiffs.

x.  Essure® is a surgery-free permanent birth-control."

      ○  In fact, Essure® is not permanent as the coils can migrate, perforate organs, and be expelled by the body.

**G.**    **ADVERTISEMENT WARRANTIES**

360.    Defendants advertised the following false or misleading representations:

i.  "Zero pregnancies" in its clinical trials.

      ○ In fact, there were **at least four pregnancies**.  Defendants concealed this information from Plaintiffs.

ii.  In order to be identified as a qualified Essure® physician, a minimum of one Essure® procedure must be performed every 6-8 weeks.

      ○  In fact, Defendants **"signed off" on "Essure® physicians" who did not perform the procedure every 6-8 weeks**, including the

implanting physicians.  Defendants concealed this information from
Plaintiffs.

**H.**   **PHYSICIAN TRAINING MANUAL WARRANTIES**

361.   In their physician training manuals, Defendants stated:

i.   "99% of women rated their comfort as good to excellent at all follow-up
visits"

o   In fact, the actual choices given to the clinical participants were 'poor,'
'very good' or 'excellent.'  Defendants concealed this information
from Plaintiffs.

**I.**   **WARRANTIES BY AGENTS**

362.   Defendants' Senior Director of Global Professional Education represented to the
public:

ii.   "For the Essure® procedure, the patient is not under anesthesia, therefore a
skilled approach is crucial."

o   Yet, Defendants also publicly claim that "[c]orrect placement . . . is
performed easily because of the design of the micro-insert."

o   In reality, most Essure® devices are placed while the patient is under
anesthesia.

363.   Defendants' CEO stated:

i.   "Essure® allows you to push away the constant worry about an unplanned
pregnancy that's our message and that's our theme."

- o In fact, there were actually **four pregnancies during the clinical trials and five pregnancies during the first year of commercial experience.**  Defendants concealed this information from Plaintiffs.

- o From 1997-2005, **64 pregnancies were reported to Defendants**. Defendants concealed this information from Plaintiffs.

- o There have been over **30 pregnancies after "doctors confirmed the tubes were blocked."**

- o In contrast, Defendants' SEC filings, Form 10-k, show that the HSG test used to confirm the tubes are blocked has been described by Defendants as "**painful and is also known to be highly inaccurate, with false-positive results in as many as 40%."**

## J.  <u>MARKETING WARRANTIES</u>

364.    Defendants marketed with televised commercials containing the following false or misleading representations:

- i.  Essure® has been in use for over 5 years.

  - o In fact, Essure® was **only in use for 4 years** at the time of this. Defendants concealed this information from Plaintiffs.

- ii.  "The non-surgical permanent birth control for women."

  - o In fact, the procedure is most commonly done with surgery. Defendants concealed this information from Plaintiffs.

  - o Essure® is not permanent because the coils can migrate, perforate organs, and be expelled by the body.

      o  And all Essure® procedures are done under hysteroscopy, which is a surgical procedure.

   iii.  "Essure® allows for visual confirmation of each insert's proper placement both during the procedure and during the Essure® Confirmation Test."

      o  In fact, Essure® does not allow for visual confirmation of proper placement during the procedure.

**K.**        **BROCHURE WARRANTIES**

365.   Defendants' Essure® brochure included the following false or misleading representations and warranties:

    i.  Essure® is "worry free."

      o  Defendants actively concealed and **failed to report 8 perforations** which occurred as a result of Essure® to the FDA as evidenced in a Form 483 issued by the FDA to Defendants.  Defendants actively concealed this from Plaintiffs.

      o  Defendants failed to notify the FDA of their internal records of **16,047 complaints** regarding Essure.

      o  Defendants' SEC filings, Form 10-K, show that the HSG test used to confirm the tubes are blocked has been described by Defendants as "**painful and is also known to be highly inaccurate, with false-positive results in as many as 40%.**"

      o  Defendants were issued Form 483's for not disclosing MDR's to the FDA for perforations, migrations, and instances where Essure® broke into pieces; were cited for having an incomplete risk analysis, not

> documenting non-conforming products, not following procedures used to control non-conforming products, and other quality problems.

ii. "The Essure® inserts stay secure, forming a long protective barrier against pregnancy.  They also remain visible outside your tubes, so your doctor can confirm that they're properly in place."

   o   In fact, the micro-inserts do not remain secure but can migrate and be expelled by the body.  Defendants actively concealed this information from Plaintiffs.

   o   Defendants actively concealed and **failed to report 8 perforations** which occurred as a result of Essure® to the FDA as evidenced in Form 483 issued to Defendants by the FDA.

   o   Defendants were issued Form 483's for not disclosing MDR's to the FDA for perforations, migrations, and instances where Essure® broke into pieces; were cited for having an incomplete risk analysis, not documenting non-conforming products, not following procedures used to control non-conforming product, and other quality problems.

iii. "The Essure® inserts are made from the same trusted, silicone free material used in heart stents."

   o   In fact, the micro-inserts are not made from the same material as heart stents.  Specifically, the micro-inserts are made of PET fibers which trigger inflammation and scar tissue growth.  Heart stents do not elicit tissue growth.  Defendants actively concealed this from Plaintiffs.

64

    o  PET fibers are made of the same materials as the PVT material in vaginal meshes which have a high rate of expulsion.

    o  PET fibers are not designed or manufactured for use in human implantation.

    o  Additionally, Defendants were fully aware that "the long-term nature of the tissue response to the Essure® micro-insert is not known."

    o  Defendants were issued another Form 483 when they "**<u>erroneously used non-conforming material</u>**."  Defendants actively concealed this and were issued another Form 483 for "failing to adequately document the situation."

iv.  Essure® is "surgery free":

    o  In fact, all Essure® procedures are done under hysteroscopy, which is a surgical procedure.

v.  Essure® is "Anesthesia-free"

    o  In fact, Essure® is not "anesthesia-free;" rather anesthesia is not always required.

    o  Most women are administered anesthesia prior to placement of the Essure® devices.

vi.  Step Two: "pregnancy cannot occur"; Step Three: The Confirmation.

    o  In contrast, Defendants also state that it is only after "The Confirmation" that pregnancy cannot occur, which is inconsistent with what Defendants warranted in their brochure.

- o Adverse Event Report ESS 205, dated 10/3/2006, evidences a pregnancy after the three month confirmation test was confirmed.

- o Between 1997 and 2005, **64 pregnancies** were reported to Defendants. Defendants concealed this information from Plaintiffs.

- o There have been over **30 pregnancies after "doctors confirmed the tubes were blocked."**

- o There have been incidents where the micro-inserts were expelled from the body even after the Confirmation Test, thereby making pregnancy possible.

vii. "Essure® eliminates the risks, discomfort, and recovery time associated with surgical procedures."

- o In fact, Essure® is not "surgery-free", rather surgery is not required.

- o Defendants' SEC filings, Form 10-K, show that the HSG test used to confirm the tubes are blocked has been described by Defendants as "**painful and is also known to be highly inaccurate, with false-positive results in as many as 40%.**"

viii. The PET fibers are what causes the tissue growth

- o In contrast, Defendants represented to the FDA at the PMA meeting that the trauma caused by the expanding coil striking the fallopian tubes is what causes the inflammatory response of the tissue. Defendants concealed this information from Plaintiffs.

ix. "The inserts are made from . . . safe, trusted material."

     ○  In fact, the inserts are not made of safe, trusted material as they migrate, break, and contain drugs.  In fact, Defendants refer to Essure® and classify it as a "drug."

    x.  In January 2014, Defendants represented that over 750,000 procedures had been performed.

     ○  Ten months later, Defendants admitted that only 625,000 procedures had actually been performed.

## L.   <u>PATIENT INFORMATION BOOKLET WARRANTIES</u>

366.  Defendants' Patient Information Booklet includes the following representations:

    i.  "This viewable portion of the micro-insert serves to verify placement and does not irritate the lining of the uterus."

     ○  However, the device does irritate the uterus and, in some cases, has even become embedded within patients' uteruses.  Defendants concealed this information from Plaintiffs.

     ○  Defendants actively concealed and failed to report 8 perforations which occurred as a result of Essure® to the FDA as evidenced in Form 483.

     ○  Defendants were issued Form 483's for not disclosing MDR's to the FDA for perforations, migrations, and instances where Essure® broke into pieces; were cited for having an incomplete risk analysis, not documenting non-conforming product, and other quality problems.

    ii.  "there was no cutting, no pain, no scars . . ."

- o Plaintiffs have experienced pain as a result of Essure.  Defendants concealed this information from Plaintiffs.

- o Defendants' SEC filings, Form 10-K, show that the HSG test used to confirm the tubes are blocked has been described by Defendants as "painful and is also known to be highly inaccurate, with false-positive results in as many as 40%."

- o Defendants were issued Form 483's for not disclosing MDR's to the FDA for pain.

## M.    SUMMARY OF SAFETY AND EFFECTIVENESS DATA

367.    Summary of Safety and Effectiveness Data per information provided by Defendants to the FDA states:

i.    "The Essure® System provides permanent birth control without invasive surgery or general anesthesia, and their associated risks."

- o Essure® is not "surgery-free" or "anesthesia-free," rather surgery and anesthesia are not required.

ii.    "In addition to the above benefits, none of the women in the Essure® clinical trials became pregnant while relying on Essure® for contraception."

- o In fact, there were at least four pregnancies during the clinical trials. Defendants concealed this information from Plaintiffs.

iii.    "Namely, the Essure® system is delivered hysteroscopically without general anesthesia."

- o Essure® is not "surgery-free" or "anesthesia-free," rather surgery and anesthesia is not required.

68

N.   **PMA SUPPLEMENT**

368.   Defendants represented to Plaintiffs that it was the expanding coil and tissue growth that caused the coil to become attached to the fallopian tubes—not any type of coating.

369.   However, in PMA Supplement 18, Defendants represented that "A doctor placed the coil at the uterine-fallopian tube junction, where its coating caused it to be attached to the tube."  The coating is a hydrophilic polymer coating produced at AST Products, Inc.  Defendants actively concealed this from Plaintiffs.

O.   **SEC FILINGS**

370.   In an SEC Form 10-K filing on March 15, 2011, Defendants made the following representation:

   i.   "Our Mountain View, California facility underwent an International Organization for Standardization ("ISO") inspection in August 2010 which resulted in continuing approval and ISO certification through May of 2013.  In December 2010 / January 2011 we underwent an FDA audit; all findings from the audit were satisfactorily addressed."

   o   In fact, Defendants' manufacturing facility has been inspected 7 times since July 9, 2002.  The most recent FDA audit occurred from May 30 through June 26, 2013.  The FDA has issued 4 Form 483 inspectional observations.

   o   However, Defendants actively concealed and failed to report 8 perforations which occurred as a result of Essure® to the FDA as evidenced in Form 483.

- o Defendants were issued another Form 483 when it "erroneously used non-conforming material." Defendants actively concealed this. Further, Defendants were issued another Form 483 for "failing to adequately document the situation."

- o Defendants' facility was also issued a violation as it "no longer uses pre-sterile and post-sterile cages."

- o Defendants were also issued a violation when they "failed to obtain a valid license . . . prior to manufacturing medical devices." Defendants were manufacturing devices for three years without a license.

- o Defendants failed to inform the FDA and Plaintiffs of their internal records of 16,047 complaints.

- o Defendants were issued Form 483s for not disclosing MDR's to the FDA for perforations, migrations, and instances where Essure® broke into pieces; were cited for having an incomplete risk analysis, not documenting non-confirming products, not following procedures used to control non-conforming product, and other quality problems.

P.     **ADDITIONAL FDA ACTION IN 2016**

371.    On February 29, 2016, the FDA announced actions to provide important information about the risks of using Essure® and to help women and their doctors be better informed of the potential complications associated with implantable forms of sterilization. The FDA issued a new, mandatory clinical study for Essure® to determine heightened risks for particular women. The FDA also intends to require changes to product labeling, including a boxed warning and a Patient Decision Checklist to help ensure that women receive and

understand information regarding the benefits and risks of this type of device.  The FDA has issued a draft guidance to provide the public an opportunity to comment on the proposed language to be included in these warnings.

372.    As the FDA stated in its News Release issued on February 29, 2016, "[w]hile the FDA believes Essure® remains an appropriate option for the majority of women seeking a permanent form of birth control, some women may be at risk for serious complications . . . [including] persistent pain, perforation of the uterus or fallopian tubes from device migration, abnormal bleeding and allergy or hypersensitivity reactions."

373.    Moreover, William Maisel, M.D., M.P.H., deputy director for science and chief scientist at the FDA's Center for Devices and Radiological Health, acknowledged that the FDA's actions "also reflect [FDA's] recognition that more rigorous research is needed to better understand if certain women are at heightened risk of complications."

374.    On March 4, 2016, the FDA released a draft guidance to provide the public an opportunity to comment on the proposed language to be included in the warning label for Essure®.  Accordingly, the FDA proposed the following black box warning for such devices:

> **WARNING: Some patients implanted with the Essure® System for Permanent Birth Control have reported adverse events, including perforation of the uterus and/or fallopian tubes, intra-abdominal or pelvic device migration, persistent pain, and allergy or hypersensitivity reactions. Some of these reported events resulted in device removal that required abdominal surgery. This information should be shared with patients considering sterilization with the Essure® device during discussion of the benefits and risks of the device.**

375.    Additionally, the FDA proposed a patient decision checklist containing the following excerpts:

"I understand that if I experience any of the following, I should contact my physician:

- Abdominal, pelvic or back pain that develops or persists more than 1 week following insertion. Data suggest that for those women who do experience pain during and/or immediately after the procedure, most will have their symptoms resolve within a few days, and 99% will have their symptoms resolve within 1 week.
- Signs or symptoms consistent with an allergic or hypersensitivity reaction. These may include persistent changes in my skin (rash, itching) but may also include other persistent symptoms such as chest pain, palpitations, breathing difficulties or wheezing, and intestinal discomfort such as nausea, diarrhea, and vomiting. These types of events, although not reported in the clinical trials supporting device approval, have been reported by women implanted with the Essure® System.
- Other signs or symptoms that continue or recur including joint or muscle pain, muscle weakness, excessive fatigue, hair loss, weight changes, and mood changes. These types of events, although not reported in the clinical trials supporting device approval, have been reported to the FDA by women implanted with the Essure® System."

Q.    **E-FREE ACT**

376.    In November 2015, Representative Michael Fitzpatrick of the 8th District of Pennsylvania introduced the E-Free Act, H.R. 3920, which requires the FDA to withdraw its approval for Essure®.

377.    Further, on February 17, 2016, Representative Fitzpatrick also drafted a letter to Jeffrey Shuren, the Director of the Center for Devices and Radiological Health.  In this letter, Representative Fitzpatrick reported that Essure® has tragically "killed innocent women and unborn children."  Further, Representative Fitzpatrick noted that while the "FDA's public materials related to Essure® have cited five reports of fetal deaths," his office was in receipt of an independent report counting 303 fetal deaths.

72

378.     Defendants actively concealed the information pertaining to their numerous violations.  In doing so, Defendants never disclosed this information to Plaintiffs.  In fact, had Plaintiffs known that Defendants were concealing thousands of complaints of adverse reactions to Essure®, using non-conforming materials not approved by the FDA in manufacturing Essure®, not using sterile cages in manufacturing Essure®, and using an unlicensed manufacturing facility to manufacture Essure®, Plaintiffs would not have had Essure® implanted.

379.     Accordingly, Plaintiffs would not have sustained the serious personal injuries they did after being implanted with Essure® but for Defendants' wrongful conduct alleged herein.

# VI

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Express Warranty)

380.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

381.     Under Pennsylvania law, state and federal courts alike have held that claims for breach of express warranties are not preempted by the Medical Device Amendments of 1976 ("MDA") to the Federal Food, Drug and Cosmetic Act of 1938.  *Rosci v. Acromed, Inc.*, 447 Pa.Super.403 (Pa. Super. Ct. 1995); *Bentzley v. Medtronic, Inc.*, 827 F.Supp.2d 443, 454-55 (E.D. Pa. 2011).

382.     In fact, the FDA expressly stated in its CPMA notice to Defendants the following: "CDRH does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."

383.     Plaintiffs' claims arise out of injuries caused by Defendants' express warranties

made explicitly to Plaintiffs and their physicians as to the safety and effectiveness of the Essure®
device.

384.    Plaintiffs relied on Defendants' express warranties as to the safety and
effectiveness of the Essure® to their detriment.

385.    Defendants intentionally made the following statements in the brochures they
distributed to physicians to make available to patients in order to induce Plaintiffs to undergo the
Essure® procedure as opposed to using other forms of birth control:

     i.      Essure® is "worry free."

     ii.     "The Essure® inserts stay secure, forming a long protective barrier against
               pregnancy.  They also remain visible outside your tubes, so your doctor
               can confirm that they're properly in place."

     iii.    "The Essure® inserts are made from the same trusted, silicone free
               material used in heart stents."

     iv.    Essure® is "surgery free."

     v.     Essure® is "Anesthesia-free."

     vi.    Step Two: "pregnancy cannot occur."

     vii.   Step Three: "The Confirmation."

     viii.   "Essure® eliminates the risks, discomfort, and recovery time associated
               with surgical procedures."

386.    Defendants' "affirmations of fact or promise" and "descriptions" as to the safety
and effectiveness of the Essure® devices created the basis of the bargain with Plaintiffs.

387.    At all times relevant herein, Defendants' express warranties as to the safety and
effectiveness of Essure® were expressly communicated to Plaintiffs and their respective

physicians through the aforementioned Essure® brochures, advertisements, physician training manuals, and other promotional materials (i.e., promotional videos, etc.).  As such, Plaintiffs understood and accepted Defendants' express warranties as the basis of their bargain with Defendants in undergoing the implantation of the Essure® device.

388.    As a result of Defendants' breach of their express warranties, whether breached individually, jointly, and/or severally, Plaintiffs sustained the following injuries:  severe abdominal and menstrual pain, severe back pain, weight fluctuation, migraines, boils, pain during intercourse, and irregular menstrual periods.

389.    As a result of Defendants' breach, individually, jointly, and severally, Plaintiffs had to undergo additional surgical procedures, including:  surgical tubal ligation and hysterectomy.

390.    Further, some Plaintiffs may have to undergo further surgeries, diagnostic testing, treatment, and rehabilitation into the indefinite future.

391.    As a result of Defendants' breach of their express warranties, whether breached individually, jointly, and/or severally, Plaintiffs sustained significant pain and suffering, both physical and mental, and which will continue into the indefinite future.

392.    As a result of Defendants' breach of their express warranties, whether breached individually, jointly, and/or severally, Plaintiffs have been prescribed a variety of heavy-duty pain medications to treat the injuries they sustained as a result of undergoing implantation of Essure, including: Percocet and Vicodin.

393.    Plaintiffs have been forced to expend significant sums of money for treatment of the multitude of surgeries, testing, medicine, and therapies along with related expenses, all to

their significant financial detriment and loss, and for which they may have to endure significant financial expenditures into the foreseeable future.

394.    As such, Plaintiffs have suffered a significant decrease in their ability to earn money in the future, as well as a significant loss of earning capacity.

## SECOND CAUSE OF ACTION
### (Fraudulent Misrepresentation)

395.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

396.    On information and belief, Plaintiffs allege that Defendants fraudulently misrepresented the safety and effectiveness of Essure® as specifically detailed above.

397.    Under Pennsylvania law, fraud may be established even where a misrepresentation is made innocently so long as the misrepresentation relates to a matter material to the case.  As such, pleading the materiality of the misrepresentation substitutes for pleading the fraudulent misrepresentation.

398.    Alternatively, the facts misrepresented by Defendants in this case were certainly material to Plaintiffs as they would not have undergone implantation of Essure® had they been aware of Defendants' misrepresentations as to the safety and effectiveness of Essure® as a permanent birth control device.

399.    Accordingly, Defendants intentionally made the following statements in the brochures they distributed to physicians to make available to patients in order to induce Plaintiffs to undergo the Essure® procedure instead of using other forms of birth control:

      i.      Essure® is "worry free."

    ii.    "The Essure® inserts stay secure, forming a long protective barrier against pregnancy.  They also remain visible outside your tubes, so your doctor can confirm that they're properly in place."

    iii.    "The Essure® inserts are made from the same trusted, silicone free material used in heart stents."

    iv.    Essure® is "surgery free."

    v.    Essure® is "Anesthesia-free."

    vi.    Step Two: "pregnancy cannot occur."

    vii.    Step Three: "The Confirmation."

    viii.    "Essure® eliminates the risks, discomfort, and recovery time associated with surgical procedures."

400.    Plaintiffs justifiably relied on these misrepresentations and would not have undergone implantation of Essure® had they been aware of the falsity of Defendants' representations as set forth above and which violated both federal law and the CPMA.

401.    As a result of Plaintiffs' justifiable reliance on Defendants' fraudulent misrepresentations, whether individually, jointly, and/or severally made, Plaintiffs sustained the following injuries:  severe abdominal and menstrual pain, severe back pain, weight fluctuation, migraines, rashes, boils, pain during intercourse, and irregular menstrual periods.

402.    As a result of Plaintiffs' justifiable reliance on Defendants' fraudulent misrepresentations, whether individually, jointly, and/or severally made, some Plaintiffs have had to undergo additional surgical procedures, including:  surgical tubal ligation, and hysterectomy.  Further, some Plaintiffs may have to undergo further surgeries, diagnostic testing, treatment, and rehabilitation into the indefinite future.

403.     As a result of Plaintiffs' justifiable reliance on Defendants' fraudulent misrepresentations, whether individually, jointly, and/or severally made, Plaintiffs sustained significant pain and suffering, both physical and mental, which will continue into the indefinite future.

404.     As a result of Plaintiffs' justifiable reliance on Defendants' fraudulent misrepresentations, whether individually, jointly, and/or severally made, Plaintiffs have been prescribed a variety of heavy-duty pain medications to treat the injuries they sustained as a result of undergoing implantation of Essure, including: Percocet, and Vicodin.

405.     Plaintiffs have been forced to expend significant sums of money for treatment of the multitude of surgeries, testing, medicine, and therapies along with related expenses, all to their significant financial detriment and loss, and for which they may have to endure significant financial expenditures into the foreseeable future.

406.     Plaintiffs have suffered a significant decrease in their ability to earn money in the future, as well as a significant loss of earning capacity.

### THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

407.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

408.     On information and belief, Plaintiffs allege Defendants negligently misrepresented several facts relating to the safety and effectiveness of Essure® as fully alleged above in the section entitled "Facts and Warranties" and including the following.

409.     As a result of Plaintiffs' justifiable reliance on Defendants' negligent misrepresentations, whether individually, jointly, and/or severally made, Plaintiffs sustained the

following injuries:  severe abdominal and menstrual pain, severe back pain, weight fluctuation, migraines, boils, pain during intercourse, and irregular menstrual periods.

410.   As a result of Plaintiffs' justifiable reliance on Defendants' negligent misrepresentations, whether individually, jointly, and/or severally made, some Plaintiffs have had to undergo additional surgical procedures, including:  surgical tubal ligation, and hysterectomy.  Further, some Plaintiffs may have to undergo further surgeries, diagnostic testing, treatment, and rehabilitation into the indefinite future.

411.   As a result of Plaintiffs' justifiable reliance on Defendants' negligent misrepresentations, whether individually, jointly, and/or severally made, Plaintiffs sustained significant pain and suffering, both physical and mental, which will continue into the indefinite future.

412.   As a result of Plaintiffs' justifiable reliance on Defendants' negligent misrepresentations, whether individually, jointly, and/or severally made, Plaintiffs have been prescribed a variety of heavy-duty pain medications to treat the injuries they sustained as a result of undergoing implantation of Essure, including: Percocet, and Vicodin.

413.   Accordingly, Plaintiffs have been forced to expend significant sums of money for treatment of the multitude of surgeries, testing, medicine, and therapies along with related expenses, all to their significant financial detriment and loss, and for which they may have to endure significant financial expenditures into the foreseeable future.

414.   Plaintiffs have suffered a significant decrease in their ability to earn money in the future, as well as a significant loss of earning capacity.

## FOURTH CAUSE OF ACTION
### (Negligent Failure to Warn)

415.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as

though fully set forth at length herein.

416.     Plaintiffs' injuries were caused by Defendants' negligent and reckless conduct in failing to warn Plaintiffs or their implanting physicians.  In doing so, Defendants committed the following violations of federal law and its CPMA:

417.     Defendants had a duty to warn Plaintiffs and/or their implanting physicians consistent with federal law and the CPMA and included:

i.    21 C.F.R. 814, governing premarket approval of medical devices, a *Statement of material fact* means a representation that tends to show that the safety or effectiveness of a device is more probable than it would be in the absence of such a representation.  A false affirmation or **silence or an omission that would lead a reasonable person to draw a particular conclusion as to the safety or effectiveness of a device also may be a false statement of material fact**, even if the statement was not intended by the person making it to be misleading or to have any probative effect.

ii.   21 C.F.R. 814.80—A device **may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with a conditions of approval** specified in the PMA approval order for the device.

iii.  21 C.F.R. 820.65—establish and **maintain procedures for identifying with a control number each unit, lot, or batch of finished devices** and where appropriate components.  The procedures shall facilitate corrective action.

iv.   21 C.F.R. 803.1(a)—This part establishes **the requirements for medical device reporting for device user facilities, manufacturers, importers, and distributors.  If you are a device user facility, you must report deaths and serious injuries that a device has or may have caused or contributed to, establish and maintain adverse event files, and submit summary annual reports.  If you are a manufacturer or importer, you must report deaths and serious injuries that your device has or may have caused or contributed to, you must report certain device malfunctions, and you must establish and maintain adverse event files**.  If you are a manufacturer, you must also submit specified follow-up.  **These reports help us to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use.**

v.    21 C.F.R. 803.10—(a) If you are a device user facility, **you must submit reports** (described in subpart C of this part), **as follows: (1) Submit reports of individual adverse events no later than 10 work days after the day that you become aware of a reportable event :(i) Submit reports of device**

related deaths to us and to the manufacturer, if known; or (ii) **Submit reports of device-related serious injuries to the manufacturers or**, if the manufacturer is unknown, submit reports to us. (2) Submit annual reports (described in 803.33) to us.  (b) If you are an importer, you must submit reports (described in subpart D of this part), as follows: (1) Submit reports of individual adverse events no later than 30 calendar days after the day that you become aware of a reportable event: (i) Submit reports of device-related deaths or serious injuries to us and to the manufacturer; or (ii) Submit reports of device-related malfunctions to the manufacturer.  (2) [Reserved]  (c) **If you are a manufacturer, you must submit reports (described in subpart E of this part) to us, as follows: (1) Submit reports of individual adverse events no later than 30 calendar days after the day that you become aware of a reportable death, serious injury, or malfunction.  (2) Submit reports of individual adverse events no later than 5 work days after the day that you become aware of: (i) A reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health, or (ii) A reportable event for which we made a written request.  (3)** Submit supplemental reports if you obtain information that you did not submit in an initial report.

vi. 21 C.F.R. 803.50(a)—(a) If you are a manufacturer, **you must report to us no later than 30 calendar days after the day that you receive or otherwise become aware of information**, from any source, that reasonably suggests that a device that you market:(1) **May have caused or contributed to a death or serious injury**; or (2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur. (b) What information does FDA consider "reasonably known" to me? (1) You must submit all information required in this subpart E that is reasonably known to you.  **We consider the following information to be reasonably known to you: (i) Any information that you can obtain by contacting a user facility, importer, or other initial reporter; (ii) Any information in your possession; or (iii) Any information that you can obtain by analysis, testing, or other evaluation of the device.** (2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters.(3) **You are also responsible for conducting an investigation of each event and evaluating the cause of the event.**  If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information.  If you later obtain any required information that was not available at the time you filed your initial report, you must submit this information in a supplemental report under 803.56.

vii. 21 C.F.R. 803.53—**You must submit a 5-day report** to us, on Form 3500A or an electronic equivalent approved under 803.14, **no later than 5 work days after the day that you become aware that:(a) An MDR reportable**

**event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.** You may become aware of the need for remedial action from any information, including any trend analysis; or (b) We have made a written request for the submission of a 5-day report. If you receive such a written request from us, you must submit, without further requests, a 5-day report for all subsequent events of the same nature that involve substantially similar devices for the time period specified in the written request. We may extend the time period stated in the original written request if we determine it is in the interest of the public health.

viii.    21 C.F.R. 806.10—(a) **Each device manufacturer or importer shall submit a written report to FDA of any correction or removal of a device initiated by such manufacturer or importer if the correction or removal was initiated: (1) To reduce a risk to health posed by the device; or (2) To remedy a violation of the act caused by the device which may present a risk to health unless the information has already been provided as set forth in paragraph (f) of this section or the corrective or removal action is exempt from the reporting requirements under 806.1(b). (b) The manufacturer or importer shall submit any report required by paragraph (a) of this section within 10-working days** of initiating such correction or removal…

ix.    21 C.F.R. 814.84—(a) **The holder of an approved PMA shall** comply with the requirements of part 803 **and with any other requirements applicable to the device by other regulations in this subchapter or by order approving the device**. (b) Unless FDA specifies otherwise, **any periodic report shall:** (1) Identify changes described in 814.39(a) and changes required to be reported to FDA under 814.39(b)**. (2) Contain a summary and bibliography of the following information not previously submitted as part of the PMA: (i) Unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant. (ii) Reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant.** If, after reviewing the summary and bibliography, FDA concludes that the agency needs a copy of the unpublished or published reports, FDA will notify the applicant that copies of such reports shall be submitted. (3) Identify changes made pursuant to an exception or alternative granted under 801.128 or 809.11 of this chapter. (4) Identify each device identifier currently in use for the device, and each device identifier for the device that has been discontinued since the previous periodic report. It is not necessary to identify any device identifier discontinued prior to December 23, 2013.

x.    21 C.F.R. 820.65—**Each manufacturer of a device that is intended for surgical implant into the body** or to support or sustain life and whose failure

to perform when properly used in accordance with instructions for use provided in the labeling can be reasonably expected to result in a significant injury to the user **shall establish and maintain procedures for identifying with a control number each unit, lot, or batch of finished devices and where appropriate components.  The procedures shall facilitate corrective action.**  Such identification shall be documented in the DHR.

xi. 21 C.F.R. 822—Post market surveillance—This part **implements section 522 of the Federal Food, Drug, and Cosmetic Act (the act) by providing procedures and requirements for postmarket surveillance of class II and class III devices** that meet any of the following criteria: (a) Failure of the device would be reasonably likely to have serious adverse health consequences**; (b) The device is intended to be implanted in the human body for more than 1 year;**… The purpose of this part is to implement our postmarket surveillance authority to maximize the likelihood that postmarket surveillance plans will result in the collection of useful data.  These data can reveal unforeseen adverse events, the actual rate of anticipated adverse events, or other information necessary to protect the public health.

xii. (l) 21 C.F.R. 820.100(a)—6 -7- Corrective and Preventive Action-(a) Each manufacturer **shall establish and maintain procedures for implementing corrective and preventive action.**  The procedures **shall include requirements for: (1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems.**  Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems; (2) Investigating the cause of nonconformities relating to product, processes, and the quality system; (3) **Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems; (4) Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; (5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems; (6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and (7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions**, for management review.  (b) All activities required under this section, and their results, shall be documented.

xiii.    21 C.F.R. 820.70(e)(h)—(a) *General.*  **Each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications.  Where deviations from device specifications could occur as a result of the manufacturing process, the**

**manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.  Where process controls are needed they shall include: (1) Documented instructions, standard operating procedures (SOP's), and methods that define and control the manner of production;** (2) Monitoring and control of process parameters and component and device characteristics during production; (3) Compliance with specified reference standards or codes; (4) The approval of processes and process equipment; and (5) Criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples. (b) *Production and process changes.*  Each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure. Such changes shall be verified or where appropriate validated according to 820.75, before implementation and these activities shall be documented. Changes shall be approved in accordance with 820.40. **(e)** *Contamination control.*  **Each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality**. (h) *Manufacturing material.*  **Where a manufacturing material could reasonably be expected to have an adverse effect on product quality, the manufacturer shall establish and maintain procedures for the use and removal of such manufacturing material to ensure that it is removed or limited to an amount that does not adversely affect the device's quality. The removal or reduction of such manufacturing material shall be documented.**

xiv.　　21 C.F.R. 820.90—(a) *Control of nonconforming product*.  Each manufacturer **shall establish and maintain procedures to control product that does not conform to specified requirements**.  The procedures shall address the identification, documentation, evaluation, segregation, and disposition of nonconforming product.  The evaluation of nonconformance shall include a determination of the need for an investigation and notification of the persons or organizations responsible for the nonconformance. **The evaluation and any investigation shall be documented.** (b) *Nonconformity review and disposition.* (1) **Each manufacturer shall establish and maintain procedures that define the responsibility for review and the authority for the disposition of nonconforming product.  The procedures shall set forth the review and disposition process.  Disposition of nonconforming product shall be documented.**  Documentation shall include the justification for use of nonconforming product and the signature of the individual(s) authorizing the use. (2) Each manufacturer shall establish and maintain procedures for rework, to include retesting and reevaluation of the nonconforming product after rework, to ensure that the product meets its current approved specifications.  Rework and reevaluation activities, including a determination of any adverse effect from the rework upon the product, shall be documented in the DHR.

xv. 21 C.F.R. 820.90—(a) Each manufacturer **shall establish and maintain procedures for the control of storage areas and stock rooms for product to prevent mixups, damage, deterioration, contamination,** or other adverse effects pending use or distribution and to ensure that no obsolete, rejected, or deteriorated product is used or distributed. When the quality of product deteriorates over time, it shall be stored in a manner to facilitate proper stock rotation, and its condition shall be assessed as appropriate. (b) Each manufacturer shall establish and maintain procedures that describe the methods for authorizing receipt from and dispatch to storage areas and stock rooms.

xvi.    21 C.F.R. 820.180—**All records required by this part shall be maintained at the manufacturing establishment or other location that is reasonably accessible to responsible officials of the manufacturer and to employees of FDA designated to perform inspections.  Such records, including those not stored at the inspected establishment, shall be made readily available** for review and copying by FDA employee(s).  Such records shall be legible and shall be stored to minimize deterioration and to prevent loss.  Those records stored in automated data processing systems shall be backed up.

xvii.    21 C.F.R. 820.198—(a) **Each manufacturer shall maintain complaint files.  Each manufacturer shall establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit.  Such procedures shall ensure that: (1) All complaints are processed in a uniform and timely manner; (2) Oral complaints are documented upon receipt; and (3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting**. (b) Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary.  When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate. (c) **Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated, unless such investigation has already been performed for a similar complaint and another investigation is not necessary. (d) Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified.** In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of: (1) Whether the device failed to meet specifications; (2) Whether the device was being used for treatment or diagnosis; and (3) The

relationship, if any, of the device to the reported incident or adverse event. (e) When an investigation is made under this section, a record of the investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section.  The record of investigation shall include: (1) The name of the device; (2) The date the complaint was received;(3) Any unique device identifier (UDI) or universal product code (UPC), and any other device identification(s) and control number(s) used; (4) The name, address, and phone number of the complainant; (5) The nature and details of the complaint; (6) The dates and results of the investigation; (7) Any corrective action taken; and (8) Any reply to the complainant. (f) When the manufacturer's formally designated complaint unit is located at a site separate from the manufacturing establishment, the investigated complaint(s) and the record(s) of investigation shall be reasonably accessible to the manufacturing establishment. (g) If a manufacturer's formally designated complaint unit is located outside of the United States, records required by this section shall be reasonably accessible in the United States at either: (1) A location in the United States where the manufacturer's records are regularly kept; or (2) The location of the initial distributor.

xviii.   21 U.S.C. 352(q)(1) and 21 U.S.C. 331(a)—**A drug or device shall be deemed to be misbranded…If its labeling is false or misleading.  The following acts and the causing thereof are prohibited: the introduction or delivery for introduction into interstate commerce…any device that is adulterated or misbranded.**

xix.     21 U.S.C. 351(a) (h)—**A drug or device shall deemed to be adulterated**…if it has been prepared, packed, or held under insanitary conditions whereby it **may have been contaminated with filth….or its manufacturing, processing, packing, or holding do not conform with current good manufacturing practice…is…not in conformity with …an applicable condition prescribed by an order.**

xx. 21 U.S.C. 352 (q) (r)—Restricted devices using false or misleading advertising or used in violation of regulations.  **In the case of any restricted device distributed or offered for sale in any State, if (1) its advertising is false or misleading in any particular,** or (2) it is sold, distributed, or used in violation of regulations prescribed under section 360j(e) of this title. **Restricted devices not carrying requisite accompanying statements in advertisements** and other descriptive printed matter.  In the case of any restricted device distributed or offered for sale in any State, unless the manufacturer, packer, or distributor thereof includes **in all advertisements and other descriptive printed matter issued or caused to be issued by the manufacturer**, packer, or distributor with respect to that device (1) a true statement of the device's established name as defined in subsection (e) of this section, printed prominently and in type at least half as large as that used for any trade or brand name thereof, and (2) a brief statement of the intended uses

of the device and relevant warnings, precautions, side effects, and contraindications and, in the case of specific devices made subject to a finding by the Secretary after notice and opportunity for comment that such action is necessary to protect the public health, a full description of the components of such device or the formula showing quantitatively each ingredient of such device to the extent required in regulations which shall be issued by the Secretary after an opportunity for a hearing.

xxi.    FDA requirement in CPMA order—"Within **10 days after Defendant receives knowledge of any adverse reaction to report the matter to the FDA."**

xxii.   FDA requirement in CPMA order—"**Report to the FDA under the MDR whenever it receives information from any source that reasonably suggests** that the device may have caused or contributed to a serious injury."

xxiii.  FDA requirement in CPMA order—Report Due Dates- six month, one year, eighteenth month, and two year reports. (y) FDA requirement in CPMA order - **A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in a CPMA approval order for the device. 21 C.F.R. Section 814.80.**

xxiv.   FDA requirement in CPMA order—Warranties are truthful, accurate, and not misleading. . . . Warranties are consistent with applicable Federal and State law.

418.    Defendants breached these duties by not complying with its CPMA or Federal law:

i.      Defendants failed to timely provide the FDA with reports after twelve months, eighteen months and then a final report for one schedule. Defendants also failed to timely submit post approval reports for its six month, one year, eighteen month **and** two year reports.  All reports failed to meet the respective deadlines.

ii.     Defendants failed to document successful placement of Essure®concealing the failure rates.

iii. Defendants failed to notice the FDA of several adverse reactions and actively concealed the same.  Defendants **failed to report 8 perforations** which occurred as a result of Essure® **and was cited for the same by the FDA** via Form 483.[13]

iv. Defendants failed to report to the FDA information it received that reasonably suggested that the device may have caused or contributed to a serious injury concealing the injuries.  Again, Defendants **failed to report 8 perforations as adverse events which occurred as a result of Essure® to the FDA as evidenced in** Form 483.

v. Defendants failed to notice the FDA of their internal records containing **16,047 complaints.**

vi. Defendants excluded the risk assessment for safety of loose coils in its Risk Management Plan and stated that Defendants had not violated the FDCA.

vii. Defendants erroneously **used non-conforming material** in the manufacturing of Essure.

viii. Defendants failed to use **pre-sterile and post-sterile cages.**

ix. Defendants manufactured Essure® **at an unlicensed facility**.

x. Defendants manufactured Essure® for three years **without a license to do so**.

xi. Defendants failed to report complaints in which their product migrated.

---

[13] Form 483 is issued to firm management at the conclusion of inspection when an FDA investigator has observed any conditions that violate the FDCA rendering the device "adulterated."

xii.   Defendants failed to consider these complaints in their risk analysis for the design of Essure®.

xiii.   On January 6, 2011, the FDA issued a violation to Defendants for the following: "An MDR report was not submitted within 30 days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed device may have caused or contributed to a death or serious injury if the malfunction were to recur."  These failures included incidents regarding perforation of bowels, Essure® coils breaking into pieces, and Essure® coils migrating out of the fallopian tubes.  Defendants were issued these violations for dates of incidents 9/1/10. 10/26/10, 5/11/10, 10/5/10, 10/1/10, 11/5/10, 11/16/10, and 11/3/10.

xiv.   Defendants had notice of **168 perforations but only disclosed 22 to the FDA.**

xv.   On January 6, 2011, Defendants were cited for having an incomplete risk analysis of Essure®.  Specifically, the FDA found that the Design Failure Modes Effects Analysis for Essure® did not include the location of the micro-insert coil in the peritoneal cavity as a potential failure mode or effect.

xvi.   On January 6, 2011, Defendants were cited for failing to document Corrective and Preventive Action Activities.  Specifically, the FDA found that there were failures in Defendants' design.

xvii.   On July 7, 2003, Defendants were cited for not identifying **existing and potential causes of non-conforming** product and **other quality**

**problems.**  Specifically, two lot history records showed rejected raw material which was not documented on a quality assurance form, **which is used to track the data.**  (Inner/outer coil subassemblies were rejected but then not documented, leading to the question of where the rejected components went**).**

    xviii.   On July 7, 2003, Defendants were cited for **not following procedures used to control products which did not confirm to specifications.**

    xix.   Defendants failed to disclose to Plaintiffs and their respective implanting physicians the fact that **Defendants altered medical records to reflect less pain then was being reported during the clinical studies for Essure® and changed the birth dates of others to obtain certain age requirements that were needed to go through the PMA process.**

419.   Had Defendants disclosed such information as they were required to pursuant to the CPMA and federal law to Plaintiffs or their respective implanting physicians, Plaintiffs would not have had the Essure® device implanted.

420.   As a result of Defendants' negligence, individually, jointly, and severally, Plaintiffs sustained the following injuries all of which could be permanent in nature: severe abdominal and menstrual pain, severe back pain, weight fluctuation, migraines, boils, pain during intercourse, and irregular menstrual periods.

421.   As a result of Defendants' negligence, individually, jointly, and/or severally, some Plaintiffs have had to undergo additional surgical procedures, including:  surgical tubal ligation, and hysterectomy.  Some Plaintiffs may have to undergo further surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

422.     As a result of Defendants' negligence, individually, jointly, and/or severally, Plaintiffs sustained significant pain and suffering, both physical and mental, which will continue into the indefinite future.

423.     As a result of Defendants' negligence, individually, jointly, and/or severally, Plaintiffs have been prescribed a variety of heavy-duty pain medications to treat the injuries they sustained as a result of undergoing implantation of Essure®, including:  Percocet, and Vicodin.

424.     Plaintiffs have been forced to expend significant sums of money for treatment of the multitude of surgeries, testing, medicine, and therapies along with related expenses, all to their significant financial detriment and loss, for which they may have to endure significant financial expenditures into the foreseeable future.

425.     Plaintiffs have suffered a significant decrease in their ability to earn money in the future, as well as a significant loss of earning capacity.

**FIFTH CAUSE OF ACTION**
**(Negligent Training)**

426.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

427.     Defendants undertook an independent duty to train physicians on how to properly use the device necessary to properly place the Essure® micro-inserts.  However, in doing so, Defendants failed to follow the FDA's training guidelines.

428.     In voluntarily undertaking a duty to train physicians Defendants created an "Essure Training Program," created a simulation program call EssureSim, organized limited training courses, where Defendants observed physicians until Defendants believed they were competent to perform the Essure® procedure, created the Essure® Procedure Equipment

Supplies Checklist, and represented to Plaintiffs that "Physicians must be signed-off to perform Essure® procedures."

429.    By creating this training program, Defendants had a duty to abide by the FDA training guidelines for how to train implanting physicians on how to properly place Essure® using its own delivery system.  Additionally, Defendants had a duty to disclose adverse events to the physicians so that they could then properly advise their patients of the actual risks involved with undergoing the Essure® procedure.

430.    As such, pursuant to FDA-approved training regulations and guidelines, Defendants had a duty to comply with the following Federal requirements so that implanting physicians were capable of performing "competent procedures" and able to "manage possible technical issues," including the following:

> i.    Ensuring that the implanting physicians completed the required preceptoring (generally 5 Essure® procedures) in Essure® placement until he or she was competent;
>
> ii.    Ensuring that the implanting physicians had read and understood the Physician Training Manual;
>
> iii.    Ensuring that the implanting physicians monitored Plaintiffs through recovery;
>
> iv.    Ensuring that the implanting physicians were knowledgeable hysteroscopists (prior to Essure® training);
>
> v.    Ensuring that the implanting physicians were certified under the aforementioned requirements.

431.    As set forth in the Physicians Manual these requirements were necessary for:

> i.    Ensuring that the implanting physicians were selecting appropriate patients to perform the Essure® procedure on;
>
> ii.    Ensuring that the implanting physicians were appropriately counseling Plaintiffs on the known risks associated with Essure®; and

      iii.   Ensuring the implanting physician was qualified and competent to perform the Essure® procedure to ensure proper placement to preclude migration, perforation and fracturing of coils.

432. In negligently training the implanting physicians in this case, Defendants breached this duty under Pennsylvania law and as such, departed from the FDA-approved training guidelines by:

      i.   Failing to ensure that the implanting physicians completed the required preceptoring in performing Essure® procedures until they reached competency.  However, the implanting physicians did not complete the required preceptoring, which would have been five successful Essure® procedures.

      ii.   Failing to ensure that the implanting physicians read and understood the Physician Training Manual in its entirety.  Here, the implanting physicians did not understand the Physician Training Manual.

      iii.   Failing to ensure that the implanting physicians monitored Plaintiffs through recovery.  Here, the implanting physicians did not so monitor Plaintiffs through their respective recoveries.

      iv.   Failing to ensure that the implanting physicians were knowledgeable hysteroscopists (prior to participating in the Essure® training program). Here, the implanting physicians were not knowledgeable hysteroscopists prior to participating in the Essure® physician training program.

      v.   Failing to ensure that the implanting physicians were certified under the preceding requirements.  Here, the implanting physicians were not certified under Defendants' requirements.

433. Defendants' departure from the training guidelines caused Plaintiffs' Essure® devices to migrate from their fallopian tubes, perforate, and/or caused Plaintiffs to suffer the following injuries:  severe abdominal and menstrual pain, severe back pain, weight fluctuation, migraines, boils, pain during intercourse, and irregular menstrual periods.  These injuries were caused by Defendants' negligent training of the implanting physicians in the following ways:

      i.   The Essure® Training Program ensured that the implanting physicians were adequately trained in proper placement of Essure®.  However, without adequate training in this regard, implanting physicians' technique

caused the coils to migrate, perforate, and/or fracture thus, resulting in Plaintiffs' injuries.

ii.     The required preceptoring ensured that the implanting physicians were adequately trained in proper placement of Essure®.  However, without adequate training in this regard, implanting physicians' technique caused the coils to migrate, perforate, and/or fracture, thus resulting in Plaintiffs' injuries.

iii.    The requirement that the implanting physicians read and understood the Physician Training Manual ensured that implanting physicians were adequately trained in proper placement of Essure®.  However, without ensuring that they read and understood the Physician Training Manual, the implanting physicians' technique caused the coils to migrate, perforate, and/or fracture thus, resulting in Plaintiffs' injuries.

iv.     The required monitoring ensured that the implanting physicians were adequately trained in proper placement of Essure®.  However, without adequate training in this regard, implanting physicians' technique caused the coils to migrate, perforate, and/or fracture, thus resulting in Plaintiffs' injuries.

v.      The requirement that the implanting physicians be knowledgeable hysteroscopists ensured that Plaintiffs' Essure® devices were properly placed.  However, the fact that the implanting physicians were not knowledgeable hysteroscopists caused the coils to migrate, perforate, and/or fracture, thus resulting in Plaintiffs' injuries.

vi.     The requirement that the implanting physicians be certified under the requirements set forth above ensured that Plaintiffs' Essure® devices were properly placed.  However, the fact that the implanting physicians were not certified in this regard caused the coils to migrate, perforate, and/or fracture, thus resulting in Plaintiffs' injuries.

434.    As a result of Defendants' negligent training of the implanting physicians, Plaintiffs sustained the following injuries all of which could be permanent in nature:  severe abdominal and menstrual pain, severe back pain, weight fluctuation, migraines, boils, pain during intercourse, and irregular menstrual periods.

435.    As a result of Defendants' negligence, individually, jointly, and/or severally, some Plaintiffs have had to undergo additional surgical procedures, including:  surgical tubal

ligation, and hysterectomy.  Some Plaintiffs may have to undergo further surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

436.    As a result of Defendants' negligence, individually, jointly, and/or severally, Plaintiffs sustained significant pain and suffering, both physical and mental, which will continue into the indefinite future.

437.    As a result of Defendants' negligence, individually, jointly, and/or severally, Plaintiffs have been prescribed a variety of heavy-duty pain medications to treat the injuries they sustained as a result of undergoing implantation of Essure®, including:  Percocet, and Vicodin.

438.    Plaintiffs have been forced to expend significant sums of money for treatment of the multitude of surgeries, testing, medicine, and therapies along with related expenses, all to their significant financial detriment and loss, for which they may have to endure significant financial expenditures into the foreseeable future.

439.    Plaintiffs have suffered a significant decrease in their ability to earn money in the future, as well as a significant loss of earning capacity.

### SIXTH CAUSE OF ACTION
### (Negligence-Manufacturing)

440.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

441.    Defendants' negligence in manufacturing Essure® in violation of the CPMA and Federal law not only caused Essure® to be what is known as an "adulterated" and "misbranded" product but it has also caused Plaintiffs' injuries in this case.

442.    As such, Defendants violated their duty to manufacture Essure® consistent with the following regulations.  In doing so, Defendants breached their duties to Plaintiffs by violating the following:

i.   The FDA's requirements as set forth in the CPMA order – A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in a CPMA approval order for the device.  21 C.F.R. Section 814.80.

   a. In manufacturing Plaintiffs' Essure® devices using non-conforming product and rejected materials, Defendants violated this requirement as set forth in the CPMA.  Moreover, Defendants failed to document this violation on its quality assurance form.

ii.   21 C.F.R. 820.65 – Each manufacturer of a device… "shall establish and maintain procedures for identifying with a control number each unit, lot, or batch of finished devices and where appropriate components.  The procedures shall facilitate corrective action."

   a. Defendants violated this regulation by manufacturing Essure® by using non-conforming or rejected materials and failing to document its use of such.

iii.   21 C.F.R. 820.70 – (a) Each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications.  Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.

   a. Defendants violated this regulation by manufacturing Essure® by using non-conforming or rejected materials and failing to document its use of such.

iv.   21 C.F.R. 820.70(e) *Contamination control.*  Each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

   a. Defendants violated this regulation by manufacturing Essure® by using non-conforming or rejected materials and failing to document its use of such.

v.   21 C.F.R. 820.70(h) *Manufacturing material.*  Where a manufacturing material could reasonably be expected to have an adverse effect on product quality, the manufacturer shall establish and maintain procedures for the use and removal of such manufacturing material to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

        a. Defendants violated this regulation by manufacturing Essure® by using non-conforming or rejected materials and failing to document its use of such.

vi.    21 C.F.R. 820.90 (a) *Control of nonconforming product*.  Each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.  The procedures shall address the identification, documentation, evaluation, segregation, and disposition of nonconforming product.  The evaluation of nonconformance shall include a determination of the need for an investigation and notification of the persons or organizations responsible for the nonconformance.

        a. Defendants violated this regulation by manufacturing Essure® by using non-conforming or rejected materials and failing to document its use of such.

vii.    21 U.S.C. 351(h) – a device shall be deemed adulterated if. . .the methods used in, or the facilities or controls used for, its manufacture, packing, storage or installation are not in conformity with applicable requirements…

        a. Defendants violated this requirement by manufacturing Essure® in unsanitary conditions and failing to manufacture Essure® in conformance with conditions set forth in the CPMA order.  Moreover, Defendants violated this regulation by manufacturing Essure® by using non-conforming or rejected materials and failing to document its use of such.

443.    Accordingly, Defendants' breaches, as stated above, caused Plaintiffs' injuries as a result of using nonconforming and rejected materials in Plaintiffs' Essure® devices.  As such, Plaintiffs' Essure® devices did not function as intended and Plaintiffs have sustained the following injuries all of which could be permanent in nature: severe abdominal and menstrual pain, severe back pain, weight fluctuation, migraines, boils, pain during intercourse, and irregular menstrual periods.

444.    As a result of Defendants' negligent manufacture of Essure, some Plaintiffs have had to undergo additional surgical procedures, including:  surgical tubal ligation, and

hysterectomy.  Some Plaintiffs may have to undergo further surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

445.    As a result of Defendants' negligence, individually, jointly, and/or severally, Plaintiffs sustained significant pain and suffering, both physical and mental, which will continue into the indefinite future.

446.    As a result of Defendants' negligence, individually, jointly, and/or severally, Plaintiffs have been prescribed a variety of heavy-duty pain medications to treat the injuries they sustained as a result of undergoing implantation of Essure®, including: Percocet, and Vicodin.

447.    Plaintiffs have been forced to expend significant sums of money for treatment of the multitude of surgeries, testing, medicine, and therapies along with related expenses, all to their significant financial detriment and loss, for which they may have to endure significant financial expenditures into the foreseeable future.

448.    Plaintiffs have suffered a significant decrease in their ability to earn money in the future, as well as a significant loss of earning capacity.

## SEVENTH CAUSE OF ACTION
### (Loss of Consortium)
**(as to Plaintiffs Kit Campbell, Jacob Astrologo, Romeo Beltran, and Christopher Edwards)**

449.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

450.    As a direct and proximate cause of Defendants' conduct, as described above, Plaintiffs' wives, suffered and continue to suffer from the injuries as set forth previously in this Complaint.

451.    Before suffering these injuries, Plaintiffs' relationships with their wives were happy and healthy.

452.    As a direct and proximate result of these injuries, Plaintiffs' spouse's have been unable to perform the duties of a wife.  Specifically, since being implanted with Essure®, Plaintiffs' wives are no longer able to tend to everyday household chores such as cleaning, performing yard work, driving or running errands as a result of their constant severe pain.

453.    Whereas Plaintiffs' wives were once happy and energetic, this is no longer the case, as their wives now experience severe pain, depression and fatigue since being implanted with Essure®.

454.    Whereas prior to undergoing the implantation of Essure®, Plaintiffs and their wives enjoyed a healthy level of sexual intimacy, after their wives were implanted with Essure® the couples' level of sexual intimacy sharply declined.

455.    As a direct result of the injuries sustained by Plaintiffs' wives, they are no longer able to provide Plaintiffs with the society and services of a wife, such as intimacy, companionship, affection, assistance, and support.

456.    As a direct result of her injuries from the implantation of the Essure® device, Plaintiffs' wives are unable to perform the duties as a wife in the future as they had prior to being implanted with Essure®, thereby depriving Plaintiffs of the society and services of a wife.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as appropriate to each cause of action alleged and as appropriate to the standing of Plaintiffs, as follows:

1.    Past and future general damages, the exact amount of which has yet to be ascertained, in an amount according to proof at the time of trial;

2.    Past and future economic and special damages according to proof at trial;

3.    Loss of earnings and impaired earning capacity according to proof at trial;

4.   Medical expenses, past and future, according to proof at the time of trial;

5.   Equitable relief as the Court deems just and proper;

6.   Declaratory judgment that Defendants are liable to Plaintiffs for all future evaluative, monitoring, diagnostic, preventative, and corrective medical, surgical, and incidental expenses, costs and losses caused by Defendants' wrongdoing;

7.   Medical monitoring, whether denominated as damages or in the form of equitable relief according to proof at the time of trial;

8.   Punitive or exemplary damages according to proof at the time of trial;

9.   Costs of suit incurred herein;

10.  Pre-judgment interest as provided by law; and

11.  Such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:  June 3, 2016                By:  _____

                                     **MCCUNEWRIGHT LLP**
                                      Joseph G. Sauder
                                      PA Attorney ID #82467
                                      1055 Westlakes Drive, Suite 300
                                      Berwyn, PA 19312
                                      jgs@mccunewright.com

                                      **MCCUNEWRIGHT LLP**
                                      Kristy M. Arevalo, (CA # 216308)
                                      Email: kma@mccunewright.com
                                      2068 Orange Tree Lane, Suite 216
                                      Redlands, California  92374
                                      Telephone:  (909) 557-1250
                                      Facsimile:  (909) 557-1275

100